### 42545. WARREN v. THE STATE.
(336 SE2d 221)

SMITH, Justice.

"When a woman says I do, does she give up her right to say I won't?"[1] This question does not pose the real question, because

---

[1] Griffin, *In 44 States, It's Legal to Rape Your Wife*, 21 Student Lawyer. Another question posed is: "But if you can't rape your wife, who[m] can you rape?" Freeman, *"But If You Can't Rape Your Wife, Who[m] Can You Rape?": The Marital Rape Exemption Re-examined.* 15 Family Law Quarterly (1981).

rape[2] and aggravated sodomy are not sexual acts of an ardent husband performed upon an initially apathetic wife,[3] they are acts of violence that are accompanied with physical and mental abuse and often leave the victim with physical and psychological damage that is almost always long lasting.[4] Thus we find the more appropriate question: When a woman says "I do" in Georgia does she give up her right to State protection from the violent acts of rape and aggravated sodomy performed by her husband. The answer is no.[5] We affirm.

The appellant, Daniel Steven Warren, was indicted by a Fulton County Grand Jury for the rape and aggravated sodomy of his wife. They were living together as husband and wife at the time. The appellant filed a pre-trial general demurrer and motion to dismiss the indictment. After a hearing, the motions were denied. The appellant sought and was issued a certificate of immediate review and filed an

---

[2] "As one author has observed, people have 'trouble with rape' because: [T]he mention of rape makes us all uneasy — for different reasons depending on who we are. It makes men uneasiest of all perhaps, and usually brings forth an initial response of nervous laughter or guffaw-evoking jokes. After all, as far as the normal, but uninformed, man knows, rape is something he might suddenly do himself some night if life becomes too dull. It isn't, of course, but he knows too little about it to realize that.

"On the other hand, the thoughtful normal man, after hearing the details of a forcible rape, finds it difficult to believe. . . . He knows that all thoughts of sex — which he equates with fun, romance, and mutual admiration — would leave him if the woman were *really* struggling to get free.

". . . He does not realize that, to the rapist, the act is not 'love,' nor ardor, and usually not even passion; it is a way of debasing and degrading a woman. . . . This gives rise to the commonly held view that: 'There is no such thing as rape.' . . . To most women, [rape] is almost as unreal as it is to most men because they themselves have not experienced it, and few people who have done so are in the habit of talking about it. . . .

"At the same time, an occasional newspaper story about a particularly brutal rape-murder makes all women shudder. They wonder if it could possibly happen to them, and if it did, how would they react. . . ." (Emphasis in original.) Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minn. L.R. 395, 399 n. 27 (1985).

[3] Georgia has recognized both spouses' right to say "I won't" under the domestic law, by providing that before refusal of sexual intercourse rose to the level of cruel treatment in divorce, the refusal had to be "a denial, that . . . was wilful, persistent and without justification and done with an intent to cast him off as a husband completely and forever." *Harkness v. Harkness*, 228 Ga. 184, 185 (184 SE2d 566) (1971).

[4] "When you have been intimately violated by a person who is supposed to love and protect you, it can destroy your capacity for intimacy with anyone else. Moreover, many wife victims are trapped in a reign of terror and experience repeated sexual assaults over a period of years. When you are raped by a stranger you have to live with a frightening memory. When you are raped by your husband, you have to live with your rapist." National Center on Women and Family Law, Clearing House Review, November 1984, citing Dr. David Finkelhor's testimony and statement in support of H.B. 516 to remove spousal exemption to sexual assault offenses to the Judiciary Committee, New Hampshire State Legislature (Mar. 25, 1981), p. 745.

[5] It would be incongruous to find both spouses have a right under the domestic law to refuse a normal and mutual satisfying function of married life, and at the same time find that wives have no protection under the criminal law in the event their husbands engage in the violent conduct defined as rape.

application for an interlocutory appeal which was granted by this court.

1. The appellant asserts that there exists within the rape statute an implicit marital exclusion that makes it legally impossible for a husband to be guilty of raping his wife.

Until the late 1970's there was no real examination of this apparently widely held belief. Within the last few years several jurisdictions have been faced with similar issues and they have decided that under certain circumstances a husband can be held criminally liable for raping his wife. See *Commonwealth v. Chretien*, Mass., 417 NE2d 1203 (1981); *State v. Smith*, N.J. 426 A2d 38 (1981); *State v. Smith*, Fla. App., 401 S2d 1126 (1981); *People v. De Stefano*, 467 NY2d 506 (Co.Ct. 1983); *State v. Rider*, 449 S2d 903 (Fla. App. 3rd Dist. 1984); *Weishaupt v. Commonwealth*, 315 SE2d 847 (Va. 1984); *People v. Liberta*, 485 NYS2d 207 (Ct.App. 1984).

What is behind the theory and belief that a husband could not be guilty of raping his wife? There are various explanations for the rule and all of them flow from the common law attitude toward women, the status of women and marriage.

Perhaps the most often used basis for the marital rape exemption is the view set out by Lord Hale[6] in 1 Hale P.C. 629. It is known as Lord Hale's contractual theory. The statement attributed to Lord Hale used to support the theory is: "but a husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband which she cannot retreat."

There is some thought that the foundation of his theory might well have been the subsequent marriage doctrine of English law, wherein the perpetrator could, by marrying his victim, avoid rape charges. It was thus argued as a corollary, rape within the marital relationship would result in the same immunity.[7]

Another theory stemming from medieval times is that of a wife being the husband's chattel or property. Since a married woman was part of her husband's property, nothing more than a chattel, rape was nothing more than a man making use of his own property.

---

[6] Hale was Chief Justice of the Court of King's Bench from 1671 until 1675 when he resigned at age 66, one year before his death. A book based on his manuscripts was published in 1736, and the first American edition of the book was published in America in 1847, 1 M. Hale, Pleas of the Crown. Although we could not find a Georgia case that cited Hale's implied consent theory, we found a case that gives us a glimpse into Hale's world of more than three hundred years ago. "In 2 P. C. 290, this great judge and illustrious author says, 'But of all difficulties in evidence, there are two sorts of crimes, that give the greatest difficulty, namely, rapes and witchcraft, . . .'" *Smith v. State*, 77 Ga. 705, 712 (1886).

[7] The laws in America changed that doctrine, "[t]he general rule apart from statute is that the subsequent marriage of the parties is no bar to a prosecution for rape. [Cit.] . . ." 9 ALR 339.

A third theory is the unity in marriage or unity of person theory that held the very being or legal existence of a woman was suspended during marriage, or at least was incorporated and consolidated into that of her husband. In view of the fact that there was only one legal being, the husband, he could not be convicted of raping himself.

These three theories have been used to support the marital rape exemption. Others have tried to fill the chasm between these three theories with justifications for continuing the exemption in the face of changes in the recognition of women, their status, and the status of marriage. Some of the justifications include: Prevention of fabricated charges; Preventing wives from using rape charges for revenge; Preventing state intervention into marriage so that possible reconciliation will not be thwarted. A closer examination of the theories and justifications indicates that they are no longer valid, if they ever had any validity.

Hale's implied consent theory was created[8] at a time when marriages were irrevocable and when all wives promised to "love, honor, and obey" and all husbands promised to "love, cherish, and protect until death do us part." Wives were subservient to their husbands, her identity was merged into his, her property became his property, and she took his name for her own.

There have been dramatic changes in women's rights and the status of women and marriage. Today our State Constitution provides that, "no person shall be deprived of life, *liberty*, or property except by due process," (emphasis supplied) Art. I, Sec. I, Par. I, and "protection to *person* and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." (Emphasis supplied.) Art. I, Sec. II, Par. II. Our State Constitution also provides that each spouse has a right to retain his or her own property. Art. I, Sec. I, Par. XXVII. Our statutory laws provide that, "[t]he rights of citizens include, *without limitation*, the following: (1) The right of *personal security*, [and] (2) The right of *personal liberty* . . ." (Emphasis supplied.) OCGA § 1-2-6. Women in Georgia "are entitled to the privilege of the elective franchise and have the right to hold any civil office or perform any civil function as fully and completely as do male citizens." OCGA § 1-2-7. Couples who contemplate marriage today may choose either spouse's surname or a combination of both names for their married

---

[8] Hale cited no legal authority for his proposition, "[t]hus the marital exemption rule expressly adopted by many of our sister states has its [ORIGIN] in a bare, extra-judicial declaration made some 300 years ago. Such a declaration cannot itself be considered a definitive and binding statement of the common law, although legal commentators have often restated the rule since the time of Hale without evaluating its merits, [cits.]" *State v. Smith*, 426 A2d, supra at 41.

surname, OCGA § 19-3-33.1. No longer is a wife's domicile presumed to be that of her husband, OCGA § 19-2-3 and no longer is the husband head of the family with the wife subject to him. OCGA § 19-3-8. Marriages are revocable without fault by either party, OCGA § 19-5-3 (13); either party, not just the husband, can be required to pay alimony upon divorce, OCGA § 19-6-1; and both parties have a joint and several duty to provide for the maintenance, protection, and education of their children, OCGA § 19-7-2. Couples may write antenuptial agreements in which they are able to decide, prior to marriage, future settlements, OCGA § 19-3-62; and our legislature has recognized that there can be violence in modern family life and it has enacted special laws to protect family members who live in the same household from one another's violent acts, Ga. L. 1981, p. 880; OCGA § 10-13-1 et seq.

Today, many couples write their own marriage vows in which they specifically decide the terms of their marriage contract. Certainly no normal woman who falls in love and wishes " 'to marry, establish a home and bring up children' . . . a central part of the *liberty* protected by the Due Process Clause, [cits.]" (emphasis supplied) *Zablocki v. Redhail*, 434 U. S. 374, 384 (98 SC 673, 54 LE2d 618) (1978), would knowingly include an irrevocable term to her revocable marriage contract that would allow her husband to rape her. Rape "is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim. . . . Short of homicide, it is the 'ultimate violation of self.' " *Coker v. Georgia*, 433 U. S. 584, 599 (97 SC 2861, 53 LE2d 982) (1977). It is incredible to think that any state would sanction such behavior by adding an implied consent term *to all marriage contracts* that would leave *all* wives with no protection under the law from the "ultimate violation of self," *Coker*, supra at 2869, simply because they choose to enter into a relationship that is respected and protected by the law. The implied consent theory to spousal rape is without logical meaning, and *obviously conflicts* with our Constitutional and statutory laws and our regard for all citizens of this State.

One would be hard pressed to argue that a husband can rape his wife because she is his chattel. Even in the darkest days of slavery when slaves were also considered chattel, rape was defined as "the carnal knowledge of a female whether free or slave, forcibly and against her will." Georgia Code, § 4248, p. 824 (1863). Both the chattel and unity of identity rationales have been cast aside. "Nowhere in the common-law world — [or] in any modern society — is a woman regarded as chattel or demeaned by denial of a separate legal identity and the dignity associated with recognition as a whole human being." *Trammel v. United States*, 445 U. S. 40, 52, (100 SC 906, 63 LE2d 186) (1980).

We find that none of the theories have any validity. The justifica-

tions likewise are without efficacy. There is no other crime we can think of in which *all of the victims are denied protection* simply because someone might fabricate a charge; there is no evidence that wives have flooded the district attorneys with revenge filled trumped-up charges,[9] and once a marital relationship is at the point where a husband rapes his wife, state intervention is needed for the wife's protection.[10]

There never has been an expressly stated marital exemption included in the Georgia rape statute. Furthermore, our statute never included the word "unlawful" which has been widely recognized as signifying the incorporation of the common law spousal exclusion. *Commonwealth v. Chretien*, supra at 1208. A reading of the statute indicates that there is no marital exclusion. "A person commits the offense of rape when he has carnal knowledge of a female forcibly and against her will." OCGA § 16-6-1. We need not decide whether or not a common law marital exemption became part of our old statutory rape law,[11] because the rape statute that was similar to the common law definition[12] was specifically repealed in 1968, Ga. L. 1968, p. 1338, and our new broader statute, OCGA § 16-6-1, was enacted in its place which plainly on its face includes a husband.[13]

---

[9] " '[E]mbittered and vengeful wives are not rushing to their District Attorney to falsely claim rape in order to gain leverage on their husbands in a divorce. Victims are very reluctant to report the crime.' (Letter from Peter F. Sandrock, Jr., District Attorney, Benton County, Oregon, to The Women's History Research Center, Berkeley, Calif. (July 7, 1980).)" *People v. De Stefano*, 467 NYS2d, supra at 515. Furthermore, studies show that the average person finds alleged husband-wife rapes the lowest in credibility, 69 Minn. L.R. n. 63 at 408, and juries convict only 3 of 42 rape suspects in simple rapes, i.e., where there is only one assailant, he is known by the victim, and there is no evidence of extrinsic violence. 69 Minn. L.R. 395, supra n. 52 at 405.

[10] The state intervenes in cases of assault, OCGA §§ 16-5-20; 16-5-21 and battery, OCGA §§ 16-5-23; 16-5-24, and in other forms of family violence, OCGA § 19-13-1 et seq., and we have recognized that assault and battery are involved in rape. *Hardy v. State*, 159 Ga. App. 854 (285 SE2d 547) (1981).

[11] If a common law implied consent theory had attached to our earlier statutory crime of rape, it could not have survived because it conflicts with our Constitution and statutory laws. "Courts are organized and established to administer the laws of the land. In their decisions, they are bound to observe and protect those *paramount* laws which they are sworn to *support*. The laws of Georgia may be thus graduated, with reference to their obligation or authority. 1st, The Constitution of the United States. 2d, Treaties entered into by the Federal Government before, or since, the adoption of the Constitution. 3d, Laws of the United States, made in pursuance of the Constitution. 4th, The Constitution of the State. 5th, The Statutes of the State. 6th, Provincial Acts that were in force and binding on the 14th day of May 1776, so far as they are not contrary to the Constitution, laws and form of government of the State. 7th, The Common Law of England, and such of the Statute Laws as were usually in force before the revolution, with the foregoing limitation. It is the peculiar province of the Court to ascertain and declare when any two of these several species of law conflict with each other; and then it follows, as a matter of course, that the *less* must yield to the *greater*." *Flint River Steamboat Co. v. Foster*, 5 Ga. 194, 204 (1848).

[12] "Rape is the carnal knowledge of a female, forcibly and against her will."

[13] When our Criminal Code was revised, the drafters relied upon the Illinois Criminal

2. The appellant contends that there is an implicit marital exclusion within the aggravated sodomy statute that makes it legally impossible for a husband to be guilty of an offense of aggravated sodomy performed upon his wife.

Sodomy was originally defined as "the carnal knowledge and connection against the order of nature by man with man, or in the same unnatural manner with woman." Laws 1833, Cobb's 1851 Digest, p. 787. The punishment for sodomy was "imprisonment at labor in the penitentiary for and during the natural life of the person convicted of this destable crime." Id. Laws 1833.

Under the original rape and sodomy statutes, a man accused of rape could defend by alleging that the victim consented. If the consent could be proven, he could not be guilty of rape, because the third element of the offense "against her will" would be missing. One accused of sodomy could not defend by alleging consent, as lack of consent was not an element of the offense, and "where a man and a woman voluntarily have carnal knowledge and connection against the order of nature with each other, they are both guilty of sodomy, . . ." *Comer v. State*, 21 Ga. App. 306 (94 SE 314) (1917). Thus an allegation of consent would only go to show the other party's guilt. "One who voluntarily participates in an unnatural act of sexual intercourse with another is also guilty of sodomy. One who does not so participate is not guilty." *Perryman v. State*, 63 Ga. App. 819, 823 (12 SE2d 388) (1940).

In 1968 the sodomy statute was specifically repealed, Ga. L. 1968, p. 1338, and two new offenses were enacted, sodomy and aggravated sodomy, Ga. L. 1968, p. 1299. There can be no common law marital exemption under the aggravated sodomy statute based on "implied consent," when the statute was enacted in 1968 and when there clearly was no marital exemption for sodomy based on "consent" under the original sodomy statute.

3. The appellant contends that if we find no marital exemptions under the rape and aggravated sodomy statutes it would be a new interpretation of the criminal law, and to apply the statutes to him would deprive him of his due process rights.

"All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden. [Cit.]" *Rose v. Locke*, 423 U. S. 48, 50 (96 SC 243,

---

Code and the Model Penal Code. Both Codes included within their rape statutes an explicit marital exemption. "A male person . . . who has sexual intercourse with a female, not his wife, by force and against her will commits rape." Ill. Rev. Stat. § 11.1; "A male who has sexual intercourse with a female not his wife is guilty of rape if; . . ." Section 213.1 Model Penal Code. Our Legislature could have, but did not, include the words "not his wife." They chose instead to add the words "A person," which broadens the statute and which is in keeping with the enunciated purposes of the code. OCGA § 16-1-2.

46 LE2d 185) (1975). Both the rape and aggravated sodomy statutes are broadly written and they are unambiguous. This is a first application of these statutes to this particular set of facts, this is not an unforeseeable judicial enlargement of criminal statutes that are narrowly drawn. See *Bouie v. Columbia*, 378 U. S. 347 (84 SC 1697, 12 LE2d 894) (1964).

The appellant's reliance on *Hardwick v. Bowers*, 760 F2d 1202 (11th Cir. 1985) is misplaced.[14] That case dealt only with consensual sodomy not aggravated sodomy and the two are separate and distinct offenses.[15]

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 6, 1985.

*Joseph E. Roblins,* for appellant.
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Assistant District Attorney,* for appellee.

---

[14] The appellant was indicted on August 7, 1984, and *Hardwick* was decided on May 21, 1985.

[15] (a) A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another. A person commits the offense of aggravated sodomy when he commits sodomy with force and against the will of the other person.

(b) A person convicted of the offense of sodomy shall be punished by imprisonment for not less than one nor more than 20 years. A person convicted of the offense of aggravated sodomy shall be punished by imprisonment for life or by imprisonment for not less than one nor more than 20 years.