703 A.2d 180

**Patrick T. LANE**

**v.**

**STATE of Maryland.**

**No. 130, Sept. Term, 1996.**

Court of Appeals of Maryland.

Dec. 15, 1997.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, J. (retired), Specially Assigned.

WILNER, Judge.

Appellant was convicted in the Circuit Court for Wicomico County of attempted second degree rape, a second degree sexual offense, an unnatural and perverted practice, and assault and battery. After merging the assault and battery conviction, the court imposed consecutive sentences of seven years each for the attempted second degree rape and the second degree sexual offense and a concurrent two-year sentence for the unnatural and perverted practice. The victim of this conduct was appellant's wife, with whom he was then living in the marital home.

Three questions are presented in this appeal which, on our own initiative, we have elected to hear in lieu of proceedings in the Court of Special Appeals: (1) whether a man may be convicted of attempted second degree rape when the victim is his wife, with whom he is living at the time of the conduct; (2) whether the evidence sufficed to support the various convic-

tions; and (3) whether the court erred in failing to merge the unnatural and perverted practice conviction into the conviction for second degree sexual offense. The State has conceded the third issue, and, as a result, we shall vacate the two-year sentence entered on that conviction. Otherwise, we shall affirm the judgments entered below.

## I. *FACTUAL BACKGROUND*

Appellant and his wife, Tammi, were married in 1991; in October, 1995, they resided together in their marital home in Salisbury; and on the evening of October 25–26, 1995, they engaged in some form of sexual activity and had an altercation that caused Ms. Lane to call 911 for assistance. Those facts are not in dispute. Virtually everything else was; appellant and his wife gave very different testimony regarding the state of their marriage, their living arrangements, and what occurred on that October evening.

According to appellant, he and his wife had a good marriage. They shared the same bedroom, had recently vacationed together, and engaged in intimate sexual relations. Ms. Lane, who traveled a lot in her job, returned home around 11:30 p.m. on October 25; they talked for a while, and she then went to bed. In an effort to be helpful, appellant retrieved her suitcase from her car in order to wash her clothes. In the course of unpacking the suitcase, he said, he discovered a diary in which she had recorded in some detail an affair she was having. Feeling the need to discuss the matter with her, appellant went to the bedroom, put his arm around her, and awakened her. He said that he confronted her with the knowledge gained from reading the diary in an attempt to salvage their marriage, that she initially denied there was a diary but then demanded its return, and that she offered, commenced, and engaged in sexual favors to induce him to return the diary. The altercation leading her to call the police, he claimed, broke out later, when he discovered her "daytimer" in her car, which he also refused to return. Even as to that, however, he portrayed her as the aggressor, to the point of threatening him with a gun.

Had the court, in this non-jury trial, accepted appellant's version, it no doubt would have acquitted him of the charges brought against him. The court did not accept that version, however, but chose to give greater credence to Ms. Lane's version.

According to Ms. Lane, the marriage was not a happy one. They had talked about separating on a number of occasions; they occupied separate bedrooms—she slept in an upstairs bedroom and he remained downstairs on the couch; and they had not had sexual relations for more than a year. She was a supervisor for Food Lion—a grocery chain—and was responsible for stores in the Virginia Beach area and on the Eastern Shore of Maryland. That, she said, required considerable travel. On October 25, she returned home between 7:30 and 8:00 p.m. from Virginia Beach, where she had been for three days. Upon her return, appellant began to complain about her being away so much, and, after an hour or more of argument, she went upstairs to go to bed.

At some point, Ms. Lane said, she was awakened to find appellant on top of her, jumping on her. She was lying on her back, clad in her underwear and a tee shirt, and appellant was essentially sitting on her hips, straddling her legs. He was screaming that he had found out about her boyfriend and was going to ruin her and that he would henceforth do what he wanted with her, sexually. She said he grabbed her wrists with one of his hands and held them over her head and, with his other hand, penetrated her vagina. Somehow, he also managed to remove her tee shirt and underwear, expose his penis, slap her face from side to side with it, and attempt to insert it into her mouth. Ms. Lane added that "[h]e tried to have intercourse with me in between, when he didn't have his fingers inside of me." When asked to describe that effort more particularly, she said that he "kept pushing my legs apart further than they were at that point" but that "he never was able to."

Suddenly, Ms. Lane said, he stopped, resigned that she was not going to perform fellatio, and she was able, momentarily,

to jump out of bed and begin putting on her jeans. Appellant pushed her back on the bed, however, removed her jeans, and again placed his fingers in her vagina, slapped her face with his penis, and, at some point, succeeded in placing his penis in her mouth. All of this, she said, was without her consent. She attempted to resist with her legs. Once again, he "just stopped" and went downstairs. She dressed and went down as well. In the kitchen, they had an altercation over her "daytimer," which appellant had found and refused to return. Rebuffing her effort to retrieve it, he threw her against the kitchen wall, and, when she picked up a portable telephone to call the police, he grabbed it from her, pulled her hair, and threw her to the ground. Twice more she attempted to call the police, finally succeeding on her third try.

When the police arrived, they found her waiting outside the home, at the end of the driveway, hysterical. Evidence showed that she had a number of bruises on her thighs, arms, and finger.

## II. *ATTEMPTED RAPE*

### A. Preservation of Issue

Count Two of the indictment returned against appellant charged him with unlawfully attempting to violate the provisions of Article 27, Section 463 of the Annotated Code of Maryland by "attempting to commit a rape in the second degree upon Tammi Lane...." No motion challenging the sufficiency of that count was ever made; nor did appellant, at any time in the circuit court, seek a judgment of acquittal on, or a dismissal of, that count on the ground that it failed to charge a crime. His only argument with respect to the attempted rape charge dealt with the sufficiency of the State's evidence. At the conclusion of the State's case, he argued that there was insufficient testimony "that there was actually attempted vaginal intercourse" and that the State had not demonstrated that "there was an attempt that was committed by force without the consent." At the end of the entire case, he renewed his motion for judgment on the grounds raised

earlier—i.e., that the evidence was insufficient to show an attempted vaginal intercourse by force and without consent.

In this appeal, although continuing to press the argument of evidentiary insufficiency, appellant has added the separate claim that attempted rape of a spouse is not a crime in Maryland. That issue was clearly not raised in or considered by the circuit court, although it was implicitly decided in the entry of the conviction.

Ordinarily, we would not address an issue not raised in or expressly decided by the trial court. It has long been the law, however, which is now articulated in Maryland Rule 8–131(a), that a challenge to the trial court's subject matter jurisdiction may be raised on appeal even if not raised in or decided by the trial court. This exception to the general rule of preservation is based on the premise that a judgment entered on a matter over which the court had no subject matter jurisdiction is a nullity and, when the jurisdictional deficiency comes to light in either an appeal or a collateral attack on the judgment, ought to be declared so. *Thomas v. Hardisty*, 217 Md. 523, 536, 143 A.2d 618, 625 (1958); *also State v. Ambrose*, 191 Md. 353, 369, 62 A.2d 359, 367 (1948); *Cook v. Alexandria Nat'l Bank*, 263 Md. 147, 282 A.2d 97 (1971); *Ford v. State*, 330 Md. 682, 696, 625 A.2d 984, 990–91 (1993).

In this regard, it has now become recognized that a court may not validly enter a conviction on a charge that does not constitute a crime and that the deficiency in any such judgment is jurisdictional in nature. In *Williams v. State*, 302 Md. 787, 791–92, 490 A.2d 1277, 1279 (1985), we declared it "fundamental that a court is without power to render a verdict or impose a sentence under a charging document which does not charge an offense within its jurisdiction prescribed by common law or by statute" and that "where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense." *See also Townes v. State*, 314 Md. 71, 74, 548 A.2d 832, 833

(1988). The argument that attempted rape by a husband of his wife is not a crime goes to the jurisdictional sufficiency of that part of the indictment and therefore of the conviction, and, accordingly, it is an argument that is properly before us.

## B. Analysis

### (1) *Common Law Rape and Attempted Rape*

In *Hazel v. State,* 221 Md. 464, 468–69, 157 A.2d 922, 924 (1960), this Court defined the crime of common law rape as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." In conformance with that definition, we observed that "consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character." *Id.* at 469, 157 A.2d at 925. *See also Simms v. State,* 52 Md.App. 448, 453, 449 A.2d 1196, 1198 (1982); *Coward v. State,* 10 Md.App. 127, 268 A.2d 508 (1970).

Although this Court never had occasion to rule on the matter, it was an accepted part of the common law that there was, within that broad definition of the crime, an unwritten, implicit marital "exemption"—that a man could not be convicted of common law rape for having sexual intercourse with his lawful-wedded wife, even if the act was committed by force, without the wife's consent, and against her will. Although there exists an historical basis for it in earlier writings and practice, the "exemption," as pointed out in *State v. Smith,* 85 N.J. 193, 426 A.2d 38 (1981), is commonly attributed to the brief statement by Sir Matthew Hale in his HISTORY OF THE PLEAS OF THE CROWN that "the husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract." 1 SIR MATTHEW HALE, *HISTORIA PLACITORUM CORONAE* 628 (1st Amer. Ed. 1847). Hale himself gave no further explanation of that statement, but his proposition seems to be that (1) there is implicit in the marriage contract an irrevocable consent of the wife to sexual intercourse with her husband,

(2) because such intercourse occurring during the marriage is thus, by law, consented to, it is not unlawful, and (3) because it is not unlawful, it cannot constitute rape.

East, citing Hale, iterates that "a husband cannot by law be guilty of ravishing his wife, on account of the matrimonial consent which she cannot retract," (EDWARD HYDE EAST, A TREATISE ON THE PLEAS OF THE CROWN 446 (1806)). Neither Blackstone nor Hawkins nor Coke expressly mention such a proposition, one way or the other, in their works.[1] It did,

---

1.  Hale's treatise, though composed in manuscript form possibly as early as 1671, when he was promoted to be Lord Chief Justice of England, was not published until 1736, sixty years after his death in 1676. As he had left instructions in his will that no amendments to his work made by anyone else were to be included in any publication, it would seem that his views were of the law as it existed in the 1670's. *See,* in general, GILBERT BURNETT, THE LIFE AND DEATH OF SIR MATTHEW HALE (1682); *see also* Emlyn, *Mr. Emlyn's Preface* to SIR MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN, v-xxiii (1736). It is not at all clear that the English courts ever subscribed entirely to Hale's view. In *The Queen v. Clarence* [1888] 22 Q.B. 23, some of the judges of the Queen's Bench Division of the High Court of Justice commented on the proposition. *Clarence* was not a rape case. The defendant had been convicted of assaulting and inflicting grievous harm on his wife by having intercourse with her while suffering from gonorrhea, which she contracted as a result, and the issue was whether the conviction could stand. Hale's proposition arose in the context of an argument that the wife's consent to the intercourse was vitiated by the fact that she was unaware of her husband's affliction, and, in addressing the question of whether she could lawfully have refused consent had she known of the disease, a number of the judges made clear their view that a wife's consent to intercourse, as part of the marital contract, was not total and irrevocable. Judge Field was the most direct. After quoting Hale's statement, he observed that "no other authority is cited by him for this proposition, and I should hesitate before I adopted it. There may, I think, be many cases in which a wife may lawfully refuse intercourse, and in which, if the husband imposed it by violence, he might be held guilty of a crime." *Id.* at 57. Field cited as support *Popkin v. Popkin* (1794), an ecclesiastical court decision noted in *Durant v. Durant,* 162 Eng. Rep. 734, 745 n. b at 747 (1825), holding that a husband had no right to the person of his wife if her health is endangered. Judge Smith, though accepting that, at marriage, the wife consents to the husband "exercising the marital right," nonetheless assumed that that consent could be revoked. *Id.* at 37. Judge Wills took for granted that most women would likely refuse consent to intercourse with a man suffering from a venereal disease and noted that "it is, I should hope, equally true that a married woman, no less than an unmarried woman, would be justified

however, find its way into American judicial opinions and commentary.[2]

in such a refusal." *Id.* at 34. Judge Hawkins stated that, by the marriage contract, "a wife no doubt confers upon her husband an irrevocable privilege to have sexual intercourse with her *during such time as the ordinary relations created by such contract subsist between them,*" and, for that reason, the husband could not ordinarily be convicted of a rape committed by him upon her person. (Emphasis added.) He qualified that, however, by declaring that "this marital privilege" did not justify a husband in endangering his wife's health, that a wife was justified in resisting "the sexual embraces of a husband suffering from such a contagious disorder," *id.* at 51, and that if holding a husband guilty of assault under such circumstances would subject him also to a charge of rape "the opinion I have above expressed would not be changed." *Id.* at 52. Hawkins continued that, although a jury would not likely convict a husband of rape "except under very exceptional circumstances," he could "readily imagine a state of circumstances under which a husband might deservedly be punished with the penalty attached to rape." *Id.* Indeed, the only judge to embrace Hale's broad statement unreservedly was Judge Pollack, who opined that the husband's intercourse "is done in pursuance of the marital contract and of the status which was created by marriage, and the wife as to the connection itself is in a different position from any other woman, for she has no right or power to refuse her consent" even when "accompanied with conduct which amounts to cruelty." *Id.* at 64. Later English cases seemed to accept Hale's proposition but held it inapplicable when the parties were separates pursuant to court order. *See R. v. Clarke* [1942] 2 All E.R. 448; *R. v. Miller* [1953] 2 All E.R. 529; compare *R. v. O'Brien* [1974] 3 All E.R. 663.

2. We are aware of no American court that, in light of all that has more recently been learned about the nature and extent of domestic violence in marital homes, would any longer subscribe to Hale's rationale for such a rule, much less that of Judge Pollack. Indeed, in their more recent decisions, American courts have gone to some length to disavow any adherence to such a rationale. *See,* in addition to the New Jersey decision in *Smith, Warren v. State,* 255 Ga. 151, 336 S.E.2d 221 (1985); *Weishaupt v. Com.,* 227 Va. 389, 315 S.E.2d 847 (1984); *Com. v. Chretien,* 383 Mass. 123, 417 N.E.2d 1203 (1981); *Shunn v. State,* 742 P.2d 775 (Wyo.1987); *State v. Smith,* 401 So.2d 1126 (Fla.Dist.Ct.App. 1981). The New Jersey court in *Smith* suggested that Hale's notion may have been premised on the fact that, in 17th Century England, marriages themselves were more permanent, ending only by death or an Act of Parliament, and that Hale may simply have believed that, since the matrimonial vow was essentially non-retractable, so was the implied consent to the conjugal privilege. Professors Perkins and Boyce also dismiss the notion of a presumed non-retractable consent as obsolete, but, at least in 1982, supported the marital "exemption" on the ground that "an essential element of the crime is that the sex be

Whatever the rationale chosen to support the "exemption," generally the commentators accepted the proposition that, at common law, a husband could not be convicted of raping his wife through his own act of sexual intercourse, and, as we have indicated, that view also found recognition in court decisions.[3]  *See*, for example, 3 WHARTON'S CRIMINAL LAW § 279 (15th ed.1995); ROLLIN M. PERKINS, CRIMINAL LAW 156 (2d ed.1969); CLARK AND MARSHALL, A TREATISE ON THE LAW OF CRIMES § 11.01 (7th ed.1967); HYMAN GINSBERG AND ISADORE GINSBERG, MARYLAND CRIMINAL LAW AND PROCEDURE 258 (1940); 65 AM.JUR.2D *Rape*, § 39 (1972); *Frazier v. State*, 48 Tex. Crim. 142, 86 S.W. 754 (App.1905); *State v. Haines*, 25 So. 372

---

unlawful, and marital sex is not unlawful." ROLLIN M. PERKINS AND RONALD N. BOYCE, CRIMINAL LAW 203 (3d ed.1982). We find that view puzzling, to say the least, as it begs the critical question of consent. Sexual intercourse between unmarried adult men and women is also not unlawful, at least in Maryland; it becomes unlawful only when engaged in by force and without consent. Apart from that lapse in logic, there seems to be no real distinction between the Perkins and Boyce view and the one articulated by Hale. The law sanctions sexual intercourse between husband and wife because the law assumes that such intercourse, as an integral part of the marital relationship, is, *in fact*, consensual, and, to that extent, it stands on the same footing as consensual non-marital sexual intercourse. The change in philosophy with respect to the marital "exemption," whether marked by courts or by legislatures, arises from the law's belated recognition that, although that assumption may be generally true and well-justified, it is not always so, and when it is not, the justification for the "exemption" disappears. Some courts have delved for other rationales in support of Hale's statement. In *Warren v. State*, 255 Ga. 151, 336 S.E.2d 221 (1985), for example, the Georgia court suggested that Hale may have based his theory on "the subsequent marriage doctrine of English law, wherein the perpetrator could, by marrying his victim, avoid rape charges." *Id.* 336 S.E.2d at 223. The court posited that the "exemption" may also have been based on the medieval doctrine that a wife was her husband's chattel and that forcible sexual intercourse was nothing more than a husband making use of his own property, or on the common law "unity in marriage" theory, holding that, for some purposes at least, the legal existence of a married woman was incorporated into that of her husband, and that, as there was but one legal being—the husband—he could not be convicted of raping himself. *Id.*

3.  Even Hale recognized that a man could be convicted as a principal for aiding and abetting another in the rape of his wife. Hale, *supra*, at 628. *See also State v. Dowell*, 106 N.C. 722, 11 S.E. 525 (1890).

(La.1899); *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955); *State v. Dowell,* 106 N.C. 722, 11 S.E. 525 (1890). It was not uncommon, moreover, for early statutes codifying the crime of rape to include the marital "exemption" and to define the crime in terms of a man having unlawful sexual intercourse with a woman "not his wife." *See,* for example, West's Ann. Cal. Pen.Code § 261 (1913); Burns' Stats. Ann. (Ind.) § 10–4201 (1956); M.S.A. (Minn.) § 617.01 (1965); Vernon's Ann. P.C. (Tex.) art. 1183 (1963). Presumably because of that recognition, we could find no appellate decisions reporting the successful prosecution of a husband for raping his wife.

Until 1976, rape was entirely a common law crime in Maryland. The penalty for it was provided by statute— ranging from 18 months to life imprisonment—but not the definition of the crime. Nonetheless, the General Assembly accepted the general belief that a marital "exemption" did exist. We may infer that, in part, from the fact that, when, in 1898, it created the statutory crime of carnal knowledge of a female between 14 and 16 years of age—i.e., of an age at which it was then lawful, under certain circumstances, for a woman to marry—the Legislature made it unlawful for a person to carnally know "any female *not his wife,* between the ages of fourteen and sixteen years." (Emphasis added.) 1898 Md. Laws, ch. 218; Maryland Code (1957, 1971 Repl.Vol.) § 464 of Article 27. Note, by comparison, former § 462 of Article 27, prohibiting carnal knowledge of a child under 14, for which there was no such "exemption." More direct and substantial evidence of the Legislature's view appears in the history of legislation enacted in 1976 and 1989, which we shall shortly discuss in detail.

By Maryland common law, the attempt to commit a crime is, itself, a separate crime—a misdemeanor.[4] As we pointed out in *Cox v. State,* 311 Md. 326, 330–31, 534 A.2d 1333, 1335

---

4. Occasionally, the General Assembly has made the attempt to perform certain acts a statutory crime. In 1996, for example, it made attempted rape a statutory felony. *See* 1996 Md. Laws, ch. 632, adding § 464F to Article 27. Appellant's conviction rested on the common law misdemeanor.

(1988), attempt "is an adjunct crime, it cannot exist by itself, but only in connection with another crime," and it thus "expands and contracts and is redefined commensurately with the substantive offense." *See also Hardy v. State,* 301 Md. 124, 482 A.2d 474 (1984). Subject to some exceptions, common law attempt has been held applicable to common law crimes and to a number of statutory offenses. *Bruce v. State,* 317 Md. 642, 645, 566 A.2d 103, 104 (1989). There are, however, at least two categories of substantive crimes, to which criminal attempt has been held inapplicable. The first consists of crimes that do not require at least a general criminal intent. *Cox v. State, supra,* 311 Md. at 331, 534 A.2d at 1335: "There is an exception, however, to the general rule that attempt applies to all offenses. Crimes that do not involve intent to do a criminal act generally fall outside the scope of the crime of attempt. If there is no intent to do a wrongful act, then usually there is no crime of attempt." The second category consists of substantive crimes that are, themselves, in the nature of attempts. Simple assault is often cited as an example. Although we need not decide the matter here, there may be other crimes as well that may not be suitable for serving as the basis of a criminal attempt. Rape, however, is not a crime that would fall into any of those categories. Attempted rape was clearly a common law crime. *Mitchell v. State,* 82 Md. 527, 34 A. 246 (1896); *Walker v. State,* 53 Md.App. 171, 452 A.2d 1234 (1982); *Gray v. State,* 43 Md.App. 238, 403 A.2d 853 (1979).

■ A person is guilty of a criminal attempt when "with intent to commit a crime, he [or she] engages in conduct which constitutes a substantial step toward the commission of that crime, whether or not his [or her] intention is accomplished." *Townes v. State, supra,* 314 Md. at 75, 548 A.2d at 834; *Grill v. State,* 337 Md. 91, 94, 651 A.2d 856, 857 (1995); *Cox v. State, supra,* 311 Md. 326, 534 A.2d 1333; *Gray v. State,* 43 Md.App. 238, 403 A.2d 853 (1979). The act in furtherance of the intent must go "beyond mere preparation." *Cox v. State, supra,* 311 Md. at 330, 534 A.2d at 1335.

Although we expressly declined to decide the issue in *Grill v. State, supra,* 337 Md. 91, 651 A.2d 856, and need not do so in this case, we did note in *Grill* the widely held view that a person could not lawfully be convicted of attempting to commit a crime if, under the circumstances, it would have been legally impossible for him to be convicted of the substantive crime had his intended acts been completed. *Id.* at 95, 651 A.2d at 857–58. We described the defense of legal impossibility as articulated in *United States v. Berrigan,* 482 F.2d 171, 188 (3d Cir.1973):

"Legal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime. Thus, legal impossibility would apply to those circumstances where (1) the motive, desire and expectation is to perform an act in violation of the law; (2) there is intention to perform a physical act; (3) there is a performance of the intended physical act; and (4) the consequence resulting from the intended act does not amount to a crime."

*See also Waters v. State,* 2 Md.App. 216, 226, 234 A.2d 147, 154 (1967), where the Court of Special Appeals stated, in *dicta,* that "[l]egal impossibility to commit the intended crime may be a valid defense and where the impossibility arises by operation of law the accused cannot be convicted of an attempt" and that, as a result, "at common law a boy under 14 years of age cannot commit the crime of rape and thus cannot be convicted of attempted rape." *See also In re Appeal No. 568 September Term 1974,* 25 Md.App. 218, 333 A.2d 649 (1975). Under that view, if the proposition were accepted that a man could not lawfully have been convicted of raping his wife, by virtue of his own completed act of sexual intercourse with her, it would also have been the case that he could not lawfully have been convicted of attempting to rape her by virtue of attempting to have sexual intercourse with her. Whether that was, in fact, the common law in Maryland prior to 1976 is an open question.

### (2) *1976 and 1989 Legislation*

The relevant 1976 legislation originated with Senate Bill 358, which was the product of a legislatively created Special

Committee on Rape and Related Offenses. As introduced, the bill would have repealed the common law of rape and, through new sections 462 through 464C of Article 27 of the Maryland Code, included the conduct constituting that crime in one or more new statutory sexual offenses. A major thrust of the bill, in that regard, was to treat unlawful vaginal intercourse more or less the same as other unlawful kinds of sexual assault. It also provided, in its initial form, that a person could not be prosecuted under the new subtitle "if the complainant is the person's legal spouse unless the parties are living separate and apart, pursuant to court order." In supporting that limited provision, the then–extant Governor's Commission to Study Implementation of the Equal Rights Amendment (which amendment had been added to the Maryland Constitution in 1972) noted as one of the problems with the existing law that "[t]he word 'unlawful' in the common law definition of rape has been interpreted by the Maryland courts to mean that a person cannot rape his spouse even if the couple is living separate and apart." [5]

Ultimately, as the result of extensive amendments made to the bill by the House of Delegates, the crime of rape was retained as a statutorily defined offense but was split into two degrees, and four degrees of other sexual offenses were created. Under the law, as enacted, first degree rape (§ 462) is defined as vaginal intercourse by force or threat of force against the will and without the consent of the other person, accompanied by (1) the use or display of a dangerous weapon, (2) suffocation, strangulation, disfigurement, or other serious physical injury, (3) placing the victim in fear that the victim or a person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnaping, or (4) the perpetrator being aided or abetted by one or more other persons. Second degree rape (§ 463) consists of vaginal intercourse (1) by force or threat of

---

5. The Commission cited no authority for that statement. As we indicated, it does not appear that either this Court or the Court of Special Appeals had ever announced such a view, although it is possible that one or more circuit courts had taken that position.

force against the will and without the consent of the victim, or (2) with a person who is mentally defective, mentally incapacitated, or physically helpless and the perpetrator knows or should know that the victim has that condition.

The four degrees of other sexual offenses, defined in §§ 464 through 464C, are principally based on a "sexual contact" or a "sexual act" other than vaginal intercourse, accompanied by varying forms of aggravation. "Sexual contact" is defined as "the intentional touching of any part of the victim's or actor's anal or genital areas or other intimate parts for purposes of sexual arousal or gratification or for abuse of either party," including the penetration by any part of a person's body, other than the penis, mouth or tongue, into the genital or anal opening, if that penetration can be reasonably construed as being for the purpose of sexual arousal or gratification, or for the abuse of either party. § 461(f). A "sexual act" is defined to exclude vaginal intercourse but to include cunnilingus, fellatio, analingus, anal intercourse, and the penetration by any object into the genital or anal opening of another person's body. § 461(e). First and second degree sexual offenses are essentially parallels to first and second degree rape. A first degree sexual offense (§ 464) consists of engaging in a sexual *act* with another person under the same conditions that, if the act were vaginal intercourse, would constitute first degree rape; a second degree sexual offense (§ 464A) consists of engaging in a sexual *act* with another person under circumstances that, if the act were vaginal intercourse, would constitute second degree rape.[6]

A third degree sexual offense (§ 464B) consisted of (1) a sexual *contact* against the will and without the consent of the other person accompanied by any of the other aggravating factors included as elements of first or second degree rape or first or second degree sexual offense; (2) sexual *contact* with a person who is mentally defective, mentally incapacitated, or

---

**6.** This is our characterization of the offenses. The statutes actually repeat the same aggravating circumstances stated in the sections dealing with first and second degree rape.

physically helpless; (3) sexual *contact* with another person under the age of 14 if the perpetrator is four or more years older than the victim; or (4) a sexual *act* or vaginal intercourse with another person 14 or 15 years old if the perpetrator is at least 21 years of age. A fourth degree sexual offense (§ 464C) was defined as (1) a sexual *contact* against the will and without the consent of the victim, or (2) a sexual *act* or vaginal intercourse with a person 14 or 15 years old by a person at least four years older than the victim but not yet 21 years of age.[7]

Having established and defined those substantive offenses, the General Assembly turned its attention to the marital "exemption." In § 464D, it provided that "a person may not be prosecuted under Sections 462 [first degree rape], 463 [second degree rape], 464B [third degree sexual offense], and 464C [fourth degree sexual offense] if the victim is the person's legal spouse at the time of the commission of the alleged rape or sexual offense unless the parties are living separate and apart pursuant to a decree of divorce a mensa et thoro." With this formulation, the Legislature, on the one hand, expressly recognized and confirmed a general marital "exemption" for those offenses but, as to those offenses, chose to treat parties who were living apart pursuant to a decree of limited divorce as though they were not married at all and were, in effect, legal strangers to one another. In that limited circumstance, a husband was made subject to the same liability for engaging in the proscribed conduct against his wife as he would be if he committed it against any other woman.[8]

There is nothing in the legislative history of the 1976 legislation to indicate that the General Assembly, in creating

---

7. Amendments to some of these sections, not relevant to our discussion here, were made by 1978 Md. Laws, ch. 205.

8. Section 464D made no mention of first or second degree sexual offenses, presumably because the Legislature believed that it was not necessary to do so. The marital "exemption," even as articulated by Hale, applied only to common law rape, which involved vaginal intercourse, and never applied to the kind of conduct constituting a "sexual act."

the new statutory offenses, in codifying a general marital "exemption" with respect to first and second degree rape and third and fourth degree sexual offenses, and in making that "exemption" inapplicable in the limited circumstance noted, gave any thought, one way or the other, to the separate common law crime of attempt. There is nothing to suggest that it ever accepted or rejected the doctrine of legal impossibility as discussed, but not adopted, by the Court of Special Appeals in *Waters v. State, supra,* 2 Md.App. 216, 234 A.2d 147, and *In re Appeal No. 568, Term 1974, supra,* 25 Md.App. 218, 333 A.2d 649.

To the extent that the doctrine of legal impossibility, as applied to the common law crime of attempt, ever was a part of Maryland common law, subjection of persons to liability for a completed first or second degree rape or third or fourth degree sexual offense committed against the person's estranged spouse (living apart pursuant to a decree of limited divorce) abrogated the legal impossibility and thus removed the foundational underpinning of the legal impossibility doctrine. With that underpinning removed, there was no basis for exempting the perpetrator from prosecution for conduct constituting an attempt to commit those offenses. Indeed, in the limited circumstance in which prosecution for the completed offense was permitted, there is no reason to suppose that the General Assembly did not intend that result. As we indicated, at least with respect to those offenses, it effectively chose to treat a married couple living apart pursuant to a limited divorce decree as though they were not really married. Certainly, in that circumstance, there could be no greater expectation of an implied consent to sexual intimacy or to what otherwise would be legally inappropriate touchings than there would be if the marriage had, in fact, been dissolved and the parties were legal strangers to one another. That is not, of course, the situation now before us, but it is relevant as a backdrop to what the Legislature did in 1989.

In 1989, the General Assembly reconsidered the "exemption" it had provided in the 1976 legislation. The impetus for that effort was a significant and growing concern over violent

sexual assaults both within the marital home and during periods of separation not sanctioned by a limited divorce.[9] House Bill 399, enacted as 1989 Md. Laws, ch. 189, amended § 464D to (1) extend the circumstances under which a person may be prosecuted for sexual offenses against his or her estranged spouse, and (2) permit a person to be prosecuted for a more limited range of sexual offenses committed against the person's spouse, even if the parties were still living together.

With respect to offenses against an estranged spouse, the law kept in place, as new § 464D(d), the 1976 law allowing the prosecution of a spouse for first or second degree rape and for a third or fourth degree sexual offense when committed against a spouse who has been living separate and apart without cohabitation and without interruption pursuant to a decree of limited divorce. As a new provision, § 464D(b) permits prosecution under §§ 462(a), 463(a)(1), 464B(a)(1)(i), and 464B(1)(ii) for an offense against the person's "legal spouse" if the parties have lived separate and apart without cohabitation and without interruption pursuant to a written separation agreement or for at least six months immediately before "the commission of the alleged rape or sexual offense." Under that provision, the person can be prosecuted for (1) first degree rape (§ 462(a)), (2) second degree rape when the vaginal intercourse is committed by force or threat of force against the will and without the consent of the victim (§ 463(a)(1)), (3) a third degree sexual offense involving sexual contact against the will and without the consent of the victim and the employment or display of a dangerous or deadly weapon or article which the victim reasonably concludes is a

---

**9.** In supporting that reconsideration and the 1989 legislation to address the problem, the State Department of Human Resources informed the General Assembly that approximately one-third of the women seeking services through the 18 community-based battered spouse programs reported that episodes of physical violence and abuse were accompanied by forced anal or vaginal penetration, often resulting in genital or anal-genital injuries. The House of Ruth, a shelter for battered women and children, reported that, of the 987 women served by its legal clinic in the previous year, two-thirds complained of having been raped at least once during their marriage, often after separation.

dangerous or deadly weapon (§ 464B(a)(1)(i)), or (4) a third degree sexual offense involving sexual contact against the will and without the consent of the victim and the infliction of suffocation, strangulation, disfigurement, or serious physical injury upon the victim or someone else in the course of committing the offense (§ 464B(a)(1)(ii)). Excluded from the new provision is (1) a second degree rape based on the involvement of a mentally defective, mentally incapacitated, or physically helpless victim or a victim under 14 years of age, (2) a third degree sexual offense accompanied only by threats of harm, or based on the involvement of other persons as aiders or abetters or a mentally defective, mentally incapacitated, or physically helpless victim or a victim under 14 years of age, and (3) a fourth degree sexual offense.

Finally, in this regard, under new § 464D(c), the Legislature authorized the prosecution of a person for those same offenses—§§ 462(a), 463(a)(1), 464B(a)(1)(i), and 464B(a)(1)(ii)—but only if the person "uses actual force [not merely the threat of force] against the will and without the consent of the person's legal spouse." As was true in 1976, there is nothing in the legislative history of the 1989 law to indicate that the General Assembly gave any express consideration to the effect of the Act on the common law crime of attempt.

Although much of the written material presented to the legislative committees was couched in terms of marital "rape," much of it also complained about the broader problem of sexual violence and abuse committed by one spouse against another, both within the marital home and after separation.[10]

---

**10.** The Women Legislators of Maryland, for example, noted that they supported a complete removal of the spousal exemption "for the crime of rape." The presentation of the Maryland Network Against Domestic Violence was also couched in terms of "rape in marriage" and "marital rape." The State's Attorney for Baltimore City, on the other hand, regarded the proposed legislation as providing protection for spouses "from sexual abuse and rape," and the Department of Human Resources viewed the bill as setting a standard whereby "victims of crimes of sexual violence" are treated uniformly by law enforcement agencies and courts, regardless of the relationship of the victim to the perpetra-

The Senate Judicial Proceedings Committee Bill Analysis and Floor Report on the bill stuck closely, in its summary, to the actual provisions of the bill, commenting:

"This bill permits the prosecution of a person for certain specified sexual offenses committed against the will and without the consent of the person's legal spouse, including first degree rape, second degree rape involving force or threat of force, and third degree sexual offenses involving a dangerous or deadly weapon or the infliction of suffocation, strangulation, disfigurement or serious physical injury upon the victim or anyone else in the course of committing the offense, if the person and the person's legal spouse have lived separate and apart without cohabitation and without interruption pursuant to a written separation agreement executed by both spouses for at least 6 months immediately before the commission of the alleged offense.

The bill also permits prosecution for the same specified sexual offenses committed by a person against the person's legal spouse, regardless of whether the parties are separated, if the person uses force against the will and without the consent of the person's legal spouse."

Appellant's argument that a husband cannot be convicted of an attempted second degree rape of his wife rests on the proposition that no such crime existed at common law. On that premise, he urges that, in specifying only the completed crimes in the 1989 statute, the Legislature did not intend to create any new statutory offense of attempted second degree rape by a husband against his wife and that, under the doctrine of lenity and the complementary rules that penal statutes and statutes in derogation of the common law are to be construed strictly, we should not infer any such intent. In considering that argument, it is important to understand that, as framed, the argument necessarily would apply not only in the circumstance where the parties are still living together

---

tor. It is evident from the plain language of the bill that the legislative focus extended beyond the crime of rape, as the marital "exemption" was also being lifted for other sexual offenses as well.

(§ 464D(c)), but also when they are separated, even when they are separated pursuant to a decree of limited divorce (§ 464D(d)), for the Legislature said nothing more about the crime of attempt in those circumstances, in either 1976 or 1989, than it did with respect to the case of parties still living together. If, because of legislative silence, a husband cannot be convicted of attempting to rape a wife with whom he is then living (§ 464D(c)), he also cannot be convicted of attempting to rape his wife from whom he has been continuously separated pursuant to a decree of limited divorce (§ 464D(d)).

■ Unfortunately for appellant, the assumption upon which his argument rests is a fallacious one. It is not a matter of whether the Legislature created, or intended to create, a new crime of attempt that did not exist at common law. Although, as we indicated, the Legislature does occasionally opt to make certain kinds of attempts statutory offenses, it is rare that, in creating, expanding, or contracting substantive crimes, it gives any express attention to the "tag along" common law crime of attempt (or conspiracy or assault with intent to commit the new or amended crime). There is, indeed, no need for it to do so, for, as we noted in *Cox v. State,* *supra,* 311 Md. at 330, 534 A.2d at 1335, the crime of attempt automatically "expands and contracts and is redefined commensurately with the substantive offense." Thus, attempted second degree rape became a common law misdemeanor in Maryland in 1976, when the General Assembly created the substantive crime of second degree rape, and if a husband was immune from prosecution for that crime, or for the predecessor crime of attempted common law rape, it was only to the extent that he was protected by (1) a marital "exemption" with respect to the completed crime, and (2) the doctrine of legal impossibility that flowed from that "exemption." These earlier doctrines, however, were significantly limited in the 1976 and 1989 statutes. With respect to first degree rape, the forcible variety of second degree rape, and the included forms of third degree sexual offense, it is no longer legally impossible for a husband to be convicted based on conduct committed against his wife. The marital "exemption" has been clearly

abrogated with respect to that conduct, and with that abrogation, the entire foundation for any supposed immunity against prosecution for the separate crime of attempt disappeared. It is not a matter of lenity or of strict construction of statutes. The legislative intent to remove any marital "exemption" for the substantive offenses is absolutely clear and unmistakable; liability for criminal attempt simply follows as a matter of course.

In support of his argument, appellant mischaracterizes the kind of conduct at issue. He states in his brief:

"The General Assembly apparently concluded that acts such as embracing, holding, pushing, touching, and kissing, which normally would constitute force to support a rape conviction should not be criminalized where the aggressor spouse is unsuccessful in his attempt to force the resisting spouse to engage in sexual intercourse. The General Assembly probably believed that the resisting spouse's success in refusing to do something which she had willingly done many times before indicates, in most cases, that the aggressor spouse's conduct was less blameworthy than if he had applied enough force to compel sexual intercourse."

We would respond, first, that there is no basis whatever in the legislative history of either the 1976 or the 1989 legislation for those assumptions or conjectures. As noted, although much of the emphasis was on marital rape, there was deep concern expressed about other forms of sexual assault and violence among spouses as well. Moreover, to gain a conviction of attempted second degree rape, the State would have to prove a great deal more than mere "embracing, holding, pushing, touching, and kissing." As we indicated, to prove attempted rape, the State must establish both an existing intent to commit the substantive crime and conduct beyond mere preparation in furtherance of that intent. In order to gain a conviction of attempted second degree rape under § 464D(c), the State would thus have to prove, beyond a reasonable doubt, an intent by the husband to engage in vaginal intercourse by actual force (not merely the threat of force) and against the will and without the consent of his wife,

and conduct in furtherance of that intent. It is not likely that mere embracing, holding, pushing, touching, or kissing, discontinued upon direction or resistance by the spouse, would suffice, without more, to establish the requisite intent. *See Wiley v. State*, 237 Md. 560, 564, 207 A.2d 478, 480 (1965): "if one who has intended to commit a crime freely and voluntarily abandons the idea before it has progressed beyond mere preparation, he has not committed the crime of attempt."

The Legislature was very careful and deliberate in determining the circumstances under which the marital "exemption" was to be allowed or not allowed. As previously noted, where the parties are separated pursuant to a decree of limited divorce, a person is liable for all of the rape and sex offenses, to the same extent as if the victim were not his or her spouse. In that circumstance, there was clearly intended a total repudiation of any marital "exemption," including even for conduct constituting a fourth degree sexual offense. If the parties are either still living together or have not been continuously separated pursuant to a decree of limited divorce, however, they retain the marital "exemption" for conduct constituting a fourth degree sexual offense. If the parties are still together, the "exemption" is also retained for the rape offenses and third degree sexual offense unless committed by actual force. In so delineating spousal liability, the Legislature carefully balanced the right of every person to be free from sexual violence and abuse with the social and cultural realities that inhere in marriage. It had before it substantial evidence that similar kinds of laws passed in other States had not produced an avalanche of frivolous or spiteful complaints. We hold that, to the extent a person may be convicted of any of the substantive offenses set forth in §§ 462 through 464C, he or she is also subject to prosecution for attempting to commit those offenses. *See State v. Rittenhour*, 112 Ohio App.3d 219, 678 N.E.2d 293 (1996) and *People v. DeLarosa*, 172 A.D.2d 156, 568 N.Y.S.2d 47 (1991), upholding convictions against a husband for attempting to rape his wife.

### III. *SUFFICIENCY OF THE EVIDENCE*

Appellant urges that "the evidence presented below did not support the guilty findings rendered by the trial judge" in that "Ms. Lane's testimony was not credible and was not adequately supported by other evidence." That terse statement actually raises three issues, the first of which may be answered summarily. Whether Ms. Lane's testimony is credible is not for us to resolve; judging credibility, resolving conflicts in the evidence, and weighing the evidence are matters for the trial court. Md. Rule 8–131(c); *Gibson v. State*, 238 Md. 414, 209 A.2d 242 (1965).

The second issue, which requires some discussion, arises from some of the court's comments in announcing its findings, and that is whether the trial court, in fact, found Mrs. Lane's version credible. As noted at the beginning of this Opinion, appellant and his wife gave very different stories as to what occurred. The judge recognized that they were "diametrically opposed and irreconcilable versions," neither of which he was prepared to accept in full. He was particularly incredulous over Ms. Lane's explanation of the recitation in her diary as to the affair she was supposedly having. She claimed that it was not a real affair, but rather was a fantasy—a life she wished she had. The judge noted some uncertainty as to whether he "understood the meaning of her testimony" and suggested that, if her diary were a fantasy, she must be a person "who is capable of fantasizing in pretty detailed fantasy." He did not, however, express any doubt with respect to her recitation of what occurred in the bedroom.

The judge then recounted appellant's version, following which he said that "there are aspects to both of those stories that are not very plausible," but that, "as between the two, the Defendant's recounting is more implausible than the victim's." He then added that "as to which is more likely so than not, the Court has no difficulty at all in assessing that the version of events as recounted by Mrs. Lane is more likely to be the truth or closer to the truth than the Defendant's." Immediately recognizing that the appropriate standard was not a

preponderance of evidence but proof beyond a reasonable doubt, the judge examined the other evidence that might either corroborate or detract from the two versions. He noted the records of Ms. Lane's 911 calls—an abandoned call, an interrupted call, and a call that the judge described as "the voice of a hysterical woman." That evidence, corroborated by the observations made by the police officers when they arrived at the scene, the judge found, was consistent with Ms. Lane's testimony. The officers characterized her as "hysterical," "excited," and "extremely upset," which is how the judge said she sounded on the third tape. The judge recounted the medical evidence, including abrasions posterior to the vaginal outlet, which he found consistent with digital insertion and "probably" not consistent with appellant's story of consensual foreplay. Responding to the question of whether appellant could have done all of the things Ms. Lane said he did—hold her hands, remove her clothes, penetrate her vagina with his hand, and assault her with his penis—the judge concluded from the fact that, in his employment as a loss prevention officer appellant was able to subdue shoplifters without excessive violence, that appellant "is capable of holding and subduing a person against their will without leaving any substantial injuries upon them" and "[t]hat is pretty consistent with what his wife said he did to her."

Turning then to the elements of the various offenses, the judge, necessarily rejecting appellant's version, found that there was no evidence of consent and that there "certainly is evidence of force." He stated his conclusion as follows:

"The Court thinks that the corroboration supplied by the 911 tape, the police officers' testimony, hospital records, particularly when, in considering the lack of corroboration and inconsistencies and somewhat implausibilities of some aspects of the Defendant's version of what happened, are sufficient to establish beyond a reasonable doubt that he did commit an assault upon her, that the assault was committed upon her with the intent of engaging in forcible intercourse

with her, and that he did engage in forcible fellatio with her."

■ Notwithstanding that the judge found certain of the details in Ms. Lane's story puzzling or hard to accept, it is clear that, with the corroborating evidence that he described, he found, in the end, that the evidence sufficed to establish the elements of the various offenses. It is not necessary that the trier of fact believe each and every statement made by the State's witnesses, so long as, upon the totality of the evidence, it finds the elements of the crime established beyond a reasonable doubt.

■ The third issue implicit in appellant's complaint is that the judge's findings were not, in fact supported by substantial evidence and that those findings were therefore clearly erroneous. We find no merit to that claim. There was, as the judge noted, evidence that appellant attempted to have sexual intercourse with his wife by force, without her consent, and against her will and that he forced his penis into her mouth against her will and without her consent. That evidence sufficed to establish attempted second degree rape, a second degree sexual offense, and an unnatural and perverted sex act.

**SENTENCE IMPOSED ON COUNT SEVEN (UNNATURAL AND PERVERTED SEX ACT) VACATED; JUDGMENTS OTHERWISE AFFIRMED; APPELLANT TO PAY THE COSTS.**