*Dawnta Harris v. State*, No. 1515, September Term, 2019, Opinion by Graeff, J.


**CRIMINAL LAW — FELONY MURDER — MANSLAUGHTER BY VEHICLE — PREEMPTION**

Relying on *State v. Gibson*, 4 Md. App. 236 (1969), and *Blackwell v. State*, 34 Md. App. 547 (1977), appellant argues that the manslaughter by vehicle statute, now codified as Md. Code Ann., Criminal Law Article § 2-209 (2012 Repl. Vol.), preempts a charge of common law felony murder when a motor vehicle is involved. *Gibson* and *Blackwell* found preemption in situations involving "unintended homicides resulting from the operation of a motor vehicle."

Felony murder, however, is not an unintended homicide. To be sure, intent to kill is not a required element of felony murder. For a homicide to constitute murder, however, the homicide must be committed with malice, a mental state that includes an intent to do the "death-producing act in the course of the commission, or attempted commission, of a felony." Under the felony-murder rule, "the malice involved in the underlying felony is permitted to stand in the place of the malice that would otherwise be required with respect to the killing." Felony murder is not, therefore, within the scope of an unintended homicide. Accordingly, felony murder is not preempted by the manslaughter by automobile statute when the homicide involves a motor vehicle.

**CRIMINAL LAW — JUVENILLE LIFE SENTENCING — FELONY MURDER — INDIVIDUALIZED CONSIDERATION — CRUEL AND UNUSUAL PUNISHMENT**

Pursuant to this Court's decision in *Hartless v. State*, 241 Md. App. 77 (2019), a sentencing court is not required to conduct an individualized hearing to consider a defendant's "youth and all of its attendant circumstances" before imposing a sentence of life imprisonment with the possibility of parole on a juvenile convicted of felony murder.

Appellant's sentence of life with parole was not grossly disproportionate and did not constitute cruel and unusual punishment where his conduct, in driving over a person while fleeing the scene of a burglary, caused the person to lose her life.

Circuit Court for Baltimore County
Case No. 03-K-18-002254

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1515

September Term, 2019

_____

DAWNTA HARRIS

v.

STATE OF MARYLAND

_____

Graeff,
Kehoe,
Zic,

　　　　　　JJ.

_____

Opinion by Graeff, J.

_____

Filed: July 28, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On May 1, 2019, Dawnta Harris, appellant, was convicted by a jury in the Circuit Court for Baltimore County of first-degree felony murder, first-degree burglary, and theft less than $25,000. These convictions were based on his actions on May 21, 2018, when he struck and killed a Baltimore County Police officer with a stolen car during the commission of a burglary with three other individuals. Appellant, who was 16 years old at the time of the crime, was sentenced to life in prison with the possibility of parole.

On appeal, appellant presents the following questions for this Court's review, which we have rephrased slightly, as follows:

1. Has an unintentional, common law felony murder that was perpetrated by the operation of a motor vehicle been preempted by statute, thus precluding the common law offense from serving as a basis for a crime in Maryland?

2. Did the circuit court abuse its discretion and commit a constitutional violation by declining to instruct the jury that, in determining the voluntariness of appellant's statement to the police, it may consider as a factor whether there was denial of a parent at the juvenile's interrogation?

3. Is an automatic life sentence for a juvenile convicted of felony murder, without consideration of the juvenile's youth and attendant circumstances and penological justifications, unconstitutional under the Eighth Amendment's prohibition against cruel and unusual punishment?

4. Is the felony murder rule, as applied to juveniles, constitutional under the Fifth and Fourteenth Amendments' Due Process Clauses and Article 24 of the Maryland Declaration of Rights?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.

## Factual History

On May 18, 2018, Kirk Thomas arrived at his home on Linwood Avenue in Baltimore City to discover that it had been burglarized, and the spare key to his 2016 Jeep Wrangler was missing. He called the police, but just before they responded, another officer arrived at his door to investigate a hit-and-run involving that vehicle. He reported the vehicle as stolen, but he had no personal knowledge of who took it.

Three days later, on May 21, 2018, appellant, Darrell Ward, Derrick Matthews, and Eugene Genius skipped school and drove Mr. Thomas' black Jeep Wrangler from Baltimore City to the Parkville area in Baltimore County.[1] Several burglaries connected to a black Jeep occurred that afternoon.

The first, at approximately 12:30 p.m., occurred on Ardmore Avenue. Home surveillance video captured Mr. Genius stealing a package from a porch.[2] A neighbor observed a black Jeep at the residence and saw a person take the package. Although the windows of the Jeep were "heavily tinted," the neighbor could distinguish the silhouettes of four people in the Jeep as it drove by his home.

---

[1] All four of the young men were juveniles at the time. Evidence adduced at trial showed that the license plates on the Jeep had been switched. The tags belonged to a van registered in East Baltimore, but the Jeep was registered with the MVA to Mr. Thomas.

[2] Because appellant was not convicted of the theft at Ardmore Avenue or the burglary at Northwind Road, *see infra*, we need not recite those events in detail.

2

An hour later, at approximately 1:30 p.m., a black Jeep was observed outside a residence on Northwind Road. The homeowner was not present at the time, but she called the police after she returned home at approximately 4:00 p.m. and found her home "ransacked." She reported several stolen items, including an "old gaming system," a candlestick holder, jewelry, coins, a bottle of wine, and some snacks.[3]

At approximately 1:50 p.m., Kristin Roller observed a black Jeep Wrangler parked on Linwen Way, and she saw a male individual that she did not recognize looking into one of the houses on the street. She took a picture of the Jeep with her cell phone and texted it to the homeowners, who were not home at the time, to ask if they were expecting any visitors. They immediately called her back, and she called 911 when she observed two additional individuals exit the rear of the Jeep.[4]

The three individuals proceeded to walk around the sides of the house looking into windows, while a fourth individual remained in the Jeep. Ms. Roller described them to the 911 dispatcher as "African American kids." While she was waiting inside for the police to

---

[3] A shattered wall clock in the foyer was frozen at 1:35 p.m., suggesting that this was the time when the burglary occurred. A neighbor testified that he observed someone wearing an orange shirt standing outside the home by a "dark colored" Jeep in the driveway.

[4] Ms. Roller testified that one of the individuals was wearing a bright, orange sweatshirt, another was wearing a white T-shirt, and the third was wearing a black T-shirt. Police subsequently extracted from her cell phone pictures that she had taken of the three individuals and the Jeep. The State introduced some of these photos at trial.

arrive, she could see that they had entered the home. Ms. Roller called 911 again and witnessed the events described below from her window.[5]

At approximately 2:10 p.m., Officer Amy Caprio of the Baltimore County Police Department responded to Linwen Way. As she approached the Jeep, it drove away, but it soon returned to Linwen Way, which ended in a cul-de-sac. Officer Caprio positioned her squad car so it was partially blocking the exit to the cul-de-sac, and she got out of the car.

The Jeep turned around at the end of the cul-de-sac and drove toward her. As discussed in further detail, *infra*, Officer Caprio drew her service weapon as the car continued to approach, pointed it at the driver, and instructed him to stop and get out of the car. The Jeep stopped inches in front of her, and she again yelled at the driver to get out. The driver's door opened, and Officer Caprio stepped in front of the Jeep. The door to the Jeep closed slightly, and then the Jeep accelerated, struck Officer Caprio, and drove away. Officer Caprio fired one gunshot, which struck the front windshield of the Jeep.[6]

---

[5] Ms. Roller called 911 three times; first to report the individuals out front, second to report that they were going around the sides of the house, and a third time to inform police that the individuals were inside the house.

[6] The timing of Officer Caprio's gunshot is somewhat unclear from the evidence presented at trial. Detective Barton testified that stills from the body-worn camera footage showed gunpowder and smoke coming out of the gun after the Jeep accelerated towards her the second time but before she fell to the ground. Ms. Roller initially testified that she heard the gunshot and then saw the Jeep drive off, but she then testified that the two events occurred "simultaneously." On appeal, the State asserts that the body-worn camera footage showed that appellant accelerated and struck her before she discharged her firearm. Appellant, however, contends that the gunshot was fired prior to accelerating. The resolution of this factual dispute does not affect the issues presented to us on appeal.

Bystanders, including Ms. Roller, rushed to the scene and attempted to administer first aid. Paramedics transported Officer Caprio to the hospital, where she was pronounced dead.

Christopher Squires was sitting on his patio a short distance from Linwen Way when he observed a Jeep traveling quickly down his quiet street. He saw the Jeep park behind a neighbor's car, and he observed the driver, a thin African American male wearing a black sweatshirt, exit the vehicle and quickly walk away. Although he was unaware of the events that had just taken place on Linwen Way, Mr. Squires notified the police because he could see that the back window of the Jeep was damaged, and he thought it was suspicious that someone would leave their car there without going into a house. He subsequently observed a bullet hole in the windshield on the driver's side.

Officer Michael Deremiek was en route to the scene at Linwen Way when he observed "a teenaged black male casually walking down the sidewalk." After arriving on the scene and hearing a description of the suspect from the neighbors, he suspected that the young man he passed on the street might have been involved. He went to look for the young man and saw him walking towards Belair Road and talking on a cell phone. Officer Deremiek got out of the car and began to approach him. He heard the young man, appellant, saying: "Where are you? Where are you?"

After some brief questioning, Officer Deremiek took appellant into custody. Officer Deremiek seized a "small black grocery bag" of loose change from appellant's person.

5

Police then brought Mr. Squires to appellant's location for a show-up, and Mr. Squires identified appellant as the young man he had seen leave the Jeep on his street.[7]

The police took appellant to headquarters, and at 3:30 p.m., they placed him in an interview room. The police seized two cell phones, which contained calls and messages from the other young men. One of the phones was registered to Mr. Ward, and appellant stated that he bought it from Mr. Ward because his phone was broken.

At approximately 6:30 p.m., appellant was read his rights and signed the *Miranda* waiver form. Detective Alvin Barton, a member of the County Homicide Unit, interviewed appellant. He did not attempt to contact appellant's parents prior to the interview. Appellant did ask to make a phone call, but he did not request the presence of a parent or an attorney, and he indicated that he understood each item on the *Miranda* waiver form as they were read to him.

---

[7] James Kolb, a neighbor on a nearby street, was sitting on his front porch when he saw three young men, subsequently identified as Mr. Matthews, Mr. Ward, and Mr. Genius, peering into empty houses shortly after 2:00 p.m. The young men ultimately left his street without entering the homes, but Mr. Kolb proceeded to follow them in his car because he thought that they were suspicious. As he was driving, Mr. Kolb also observed appellant walking down the road, but he did not make a connection between the three young men and appellant at the time. The young men subsequently were seen on surveillance cameras from various businesses at the Perry Hall Square shopping center off Belair Road. Detective Barton identified the young men on the surveillance videos as Mr. Matthews, Mr. Ward, and Mr. Genius.

The video showed the three individuals entering a taxicab. Police located the taxi driver, who testified that he picked up three young men at a Chinese restaurant in the shopping center and transported them to Frederick Douglas High School in Baltimore City. The driver further testified that one of the young men repeatedly attempted to call someone and told the others: "He's not answering the phone." One of the individuals threw what appeared to be a gun magazine out the window at some point during the ride.

Appellant told Detective Barton that he was 16 years old, he lived with this mother and sister in Baltimore City, and he was in ninth grade at Francis M. Wood High School. He said that he had spent the previous night at Mr. Ward's house in East Baltimore and went to Baltimore County at approximately 8:30 a.m. that morning to visit his girlfriend. He remained at her house for "an hour or two," and he was walking down the street toward the 7-11 to call his cousin for a ride home when he was picked up by the police.

Appellant initially claimed that he did not know anything about the Jeep. He then stated that, while he was walking, he saw the Jeep parked near where he was stopped by police. It was running, so he briefly got into the car, but he then noticed that the back windshield was broken, and realizing it may have been stolen, he got out of the vehicle.

Appellant then changed his story. He told Detective Barton that he was with Mr. Ward and a mutual friend named Ke'andre at Mr. Ward's house that morning. Mr. Ward left and came back with the Jeep and called for them to get in. Appellant declined and instead took the city bus with Ke'andre to Patterson High School.

After Ke'andre went into the school, appellant took the bus to a gas station on Orleans Street, where he was approached again by Mr. Ward, who was in the Jeep with his friend, Mr. Genius. Mr. Ward again asked appellant if he wanted to get into the car. Appellant stated that he was skeptical at first, but Mr. Ward said that "his people's had gave it to him," so appellant did not question it further and got in the car. When they

stopped at another station for gas, Mr. Ward's friend Derrick Matthews joined them in the Jeep, and the four young men drove north to Baltimore County.[8]

The young men eventually pulled up to a house. The others got out, but appellant remained in the car. The other individuals were gone for 10 to 15 minutes, and appellant was unsure what they were doing, but he knew they were doing something that they were not "suppose[d] to be doing." When they returned to the Jeep, Mr. Genius was carrying a brown cardboard box containing alcohol bottles, and Mr. Matthews had a "little green bag." The young men also had taken a "little black bag" containing loose change.

Appellant stated that Mr. Matthews then drove the Jeep to another gas station approximately 10 minutes away and put gas in the car. The young men, with Mr. Genius driving, then went to a second house on Linwen Way. Mr. Genius and Mr. Matthews got out, and Mr. Ward and appellant remained in the car.[9] The Jeep's engine was turned off, but the key was in the ignition and the battery was on so he and Mr. Ward could listen to the radio. Appellant told Detective Barton that he then told Mr. Ward: "Let's go back this time, because I don't feel safe around here. . . . I don't even know what ya'll doing. Ya'll just getting out and getting back in." He stated: "If anything happened, we all could get

---

[8] Appellant stated that he had only met Mr. Genius and Mr. Matthews once prior to these events, and they were friends of Mr. Ward. Appellant provided a description and photo identification of all three of these individuals during his interview with Detective Barton.

[9] Appellant stated that he stayed in the car when they stopped at both houses and did not go inside either house. The forensic evidence supported appellant's statement that he did not physically enter either burglarized home.

locked up for something." Mr. Ward responded that he was not going to do anything "dumb" to get himself "locked up."

Mr. Genius eventually came back to the car and got Mr. Ward, leaving appellant alone in the Jeep. While the other individuals were in the house, appellant got out of the Jeep to stretch his legs, and when he got back inside on the front passenger side, he hopped over the center console into the driver's seat and reclined the seat backwards so that he could not be seen.

At some point while he was waiting, appellant stuck his head up and saw a Baltimore County Police car approaching him. When the police car pulled up alongside him, he started the Jeep and drove off. The police car followed him while he did a U-turn and returned to Linwen Way. He then observed a female police officer get out of the car and point a gun at him. Appellant described the following:

[APPELLANT:] [T]hat's when I had put my head down and closed my eyes.

DETECTIVE: She's saying something to you, right?

[APPELLANT:] Yeah.

DETECTIVE: What is she telling you?

[APPELLANT:] I couldn't really hear her. I did hear, "Get out of the car."

DETECTIVE: Okay. All right. Did you get out of the car at any point?

[APPELLANT:] No, I was too scared to get out.

DETECTIVE: Did you start to get out [of] the car?

[APPELLANT:] Yes, I did open the door.

DETECTIVE: All right. Then what happened?

9

[APPELLANT:] I was just too scared. I was paranoid, too paranoid, I didn't know what to do. I just did whatever came to my head, which to – at least, try to pull off.

DETECTIVE: Okay. But she's she's [sic] blocking the road though.

[APPELLANT:] Yeah, but not really blocked it, but kind of is.

DETECTIVE: Like, explain it to me, I'm trying to understand.

[APPELLANT:] When I went this way, the car is like this and I stop here so I had to go around and back.

DETECTIVE: You were gonna go around it?

[APPELLANT:] Yeah.

DETECTIVE: Okay. All right.

[APPELLANT:] The only reason I didn't hear what she was saying because it was music playing a little bit –

DETECTIVE: Okay. All right.

[APPELLANT:] – and all the windows was rolled up.

DETECTIVE: You heard her say, "Get out of the car." You heard part of what she said. She's got the road blocked, and had to maneuver to the right and then back around again to fit in the spot that she had left open?

[APPELLANT:] Yeah, but when I put my head down and closed my eyes, I didn't – I didn't move the wheel. Like, I just –

DETECTIVE: Well, you didn't do that in the beginning. I mean you would have driven around in the car at first with your eyes open, or you would have never made it.

[APPELLANT:] Correct, yeah.

DETECTIVE: Okay.

[APPELLANT:] All I did was –

10

DETECTIVE: Then she's in the way.

[APPELLANT:] All I did was – the car never got put back in park, it stayed in drive. So all I did was just put my head down because I had seen a gun that was pointed directly at me.

DETECTIVE: Okay.

[APPELLANT:] So, I had put my head down and I was just gripping the wheel – the steering wheel, but I didn't want to pull off or anything. I was just – I don't know, I was getting even scareder [sic], and I ain't know what to do at all.

DETECTIVE: Okay.

[APPELLANT:] So, I had pulled straight off.

DETECTIVE: Well, did you stop when you hit her?

[APPELLANT:] No, I didn't even know I hit her.

DETECTIVE: Well, you knew she was standing when you put your head down.

[APPELLANT:] Yeah, I knew she was standing there, but I didn't know I hit her.

DETECTIVE: That's when you hit the gas, you just put your head down and didn't look?

[APPELLANT:] No, I didn't look at anything. I was too scared to look, because I didn't know if I was gonna crash, hit the police car or hit the police, I didn't know if I was gonna get shot or not.

Appellant stated that, while the gun was pointed at him and the officer was instructing him to get out, he "didn't want anything bad to happen," and he "just wanted to go home." He further stated that, after he hit the gas pedal, he heard the gun go off and thought he had been shot. When he "hit the corner," he did not know where to go, but he

11

did not feel safe there, so he kept driving and abandoned the Jeep on a nearby street and continued on foot.[10]  Appellant stated that he did not see the other three individuals again that day.[11]

## II.

### Procedural History

On May 30, 2018, appellant was charged in the Circuit Court for Baltimore County with first-degree murder (count 1); with respect to Linwen Way, first-, third-, and fourth-degree burglary, conspiracy to commit first-degree burglary, and theft of at least $1,500 but less than $25,000 (counts 2 through 6); with respect to Northwind Road, first-, third-, and fourth-degree burglary, conspiracy to commit first-degree burglary, and theft of at least $100 but less than $1,500 (counts 7 through 11); with respect to Ardmore Avenue, fourth-degree burglary and theft under $100 (counts 12 and 13); theft of at least $1,500 but less than $25,000 for the stolen Jeep Wrangler (count 14); theft under $100 for a stolen license plate (count 15); and related firearms charges (counts 16 through 19).

A jury trial commenced on April 22, 2019, and it continued for eight days.  In addition to witness testimony discussed *supra*, a crime scene technician for the State testified that the following items were recovered from the abandoned Jeep: clothing, a

---

[10] The key to the Jeep was discovered on appellant's person during the interview with Detective Barton.

[11] Mr. Ward, Mr. Genius, and Mr. Matthews were taken into custody the following day.  The record on appeal does not reflect their charges, but appellant proffered in his brief that those three young men pled guilty to felony murder and were given life sentences with all but 30 years suspended.

cardboard box of electronics (including a Nintendo game system and 12 games), coins, a school folder labeled "Eugene Genius," alcohol bottles, and a package addressed to the home on Ardmore Avenue.[12]

The owner of the home on Linwen Way testified that a brick had been thrown through the glass door in the rear of his home. Approximately $3,370 worth of items were stolen, including an X-box, an Amazon Echo Dot, an Amazon Firestick, a laptop, two iPads, an Apple Watch, a backpack, and a handgun and two magazines.

Denise Wallace, a fingerprint examiner, testified that she collected fingerprint samples from all four young men and compared them to the prints lifted from various locations and items relevant to the burglaries. Fingerprints from Mr. Matthews, Mr. Ward, and Mr. Genius were found inside the Linwen Way house. Appellant's prints were not found inside the home. Appellant's prints were present, however, inside the Jeep on the front driver's side door and on one of the Nintendo games taken from Northwind Road. The prints from the other young men also were found in the Jeep.

Mr. Ward was wearing a GPS bracelet monitored by the Department of Juvenile Services on the day in question. An expert testified that, based on the GPS data, Mr. Ward was present at Ardmore Avenue, Northwind Road, and Linwen Way around the time of the burglaries on May 21, 2018. Cell phone location data from the phones of Mr. Ward, Mr. Genius, and Mr. Matthews corroborated their presence at these locations.

---

[12] The recovered clothing included a distinctive striped jacket that matched the one worn by Mr. Genius in surveillance video from the gas station and the door camera at Ardmore Avenue.

The video captured by Officer Caprio's body-worn camera at the time of the incident was played for the jury and entered into evidence as State's Exhibit 27A. The video showed that, at 2:11 p.m., Officer Caprio's body-worn camera was activated as she turned onto Linwen Way. She followed the Jeep, and just before the circle at the end of the cul-de-sac, she stopped her car and got out. Officer Caprio positioned herself in the road adjacent to the left side of her squad car and in the direct path of the Jeep.

As the Jeep turned around at the end of the cul-de-sac and continued to drive toward her, Officer Caprio drew her service weapon and pointed it toward the driver and repeatedly yelled "stop." As the Jeep approached, she took a few steps backwards, and the Jeep stopped an arm's length in front of her. In the video, Officer Caprio is heard yelling: "Stop, stop. Get out of the car. 10-3. Get out of the car. Get out of the car right now. Get out of the fucking car. Get out of the car. Get out[.]" As she gave this instruction, she moved laterally toward the back end of her squad car so that she was no longer squarely in front of the Jeep. The driver's side door to the Jeep then opened, but no one got out. As the door opened, she moved back toward the center of Jeep.[13]

The video then shows the car advancing toward her, the body-worn camera falling to the pavement, and voices of bystanders calling for help and attempting to render aid. One bystander said: "That guy just ran her over." The video shows the Jeep leaving the

---

[13] Detective Barton testified that Officer Caprio likely stepped back in front of the Jeep to provide herself cover from the individual that appeared to be exiting the vehicle as the door opened.

14

scene with the driver's side door still open. The driver of the vehicle is not visible at any point during the video.

The medical examiner testified that Officer Caprio's cause of death was multiple injuries, including numerous fractured ribs, extensive lacerations of the liver, and hemorrhaging in various locations. These injuries were consistent with "being run over by a vehicle." The manner of death was ruled a homicide.

Detective Barton testified regarding the investigation and his interview with appellant on the evening of the arrest. The video of that interview, which included appellant's confession, discussed *supra*, was entered into evidence as State's Exhibit 67 and played for the jury. On cross-examination, Detective Barton acknowledged that there was no indication from his investigation that appellant planned the two burglaries or the package theft, or that appellant drove the Jeep prior to his encounter with Officer Caprio. Additionally, there was no evidence that appellant had stolen the Jeep from Mr. Thomas.

In closing argument, the State argued that the case against appellant on the burglary charges was based on his knowledge, complicity, and aid of the actions of the other young men, either as a primary actor or, at the very least, as an accomplice. In that regard, the prosecutor highlighted that appellant's fingerprints were found on some of the stolen items, and he was arrested with stolen change in his pockets.

With respect to the first-degree felony murder charge, the State noted that it did not have to prove an intent to kill. Rather, it had to prove only that Officer Caprio was killed during the course of the burglary.

Addressing the theft charge for the Jeep, the State argued that appellant "willfully and knowingly obtained and exerted unauthorize[d] control" over stolen property by "driving [the Jeep] from location to location." In support of its arguments, the State re-played numerous portions of the interview video.

On May 1, 2019, the jury found appellant guilty of first-degree felony murder, first-degree burglary of the home on Linwen Way, and theft of the Jeep. On August 21, 2019, the court sentenced appellant to life in prison with the possibility of parole on the conviction of first-degree felony murder, 20 years (concurrent) on the conviction for first-degree burglary, and five years (concurrent) for theft.[14]

This appeal followed.

## DISCUSSION

## I.

## Preemption

Appellant contends that his conviction for felony murder should be vacated because the "misdemeanor manslaughter by automobile statute," Md. Code Ann., Criminal Law Article ("CR") § 2-209 (2012 Repl. Vol.), "preempts all unintended homicides committed by motor vehicle." In support, appellant cites *State v. Gibson*, 4 Md. App. 236, *aff'd*, 254 Md. 399 (1969), where this Court held that the manslaughter by vehicle statute preempted the common law offense of misdemeanor manslaughter by operation of a motor vehicle, and *all* unintended homicides resulting from the use of a vehicle, and *Blackwell v. State*,

---

[14] The court noted that it would recommend that appellant be allowed to participate in the "Youthful Offender's Program" at the Patuxent Institute.

16

34 Md. App. 547, *cert. denied*, 280 Md. 728 (1977), in which we held that the manslaughter by vehicle statute preempted second-degree murder when the killing was the unintended result of the operation of a motor vehicle. Appellant urges this Court to "extend the holdings of *Gibson* and *Blackwell* to the common law offense of felony murder by continuing to find that the statutory preemption applies to *all* unintended homicides resulting from the operation of a motor vehicle."

Appellant did not argue below that he could not be convicted of felony murder because he could be prosecuted only for a violation of the misdemeanor manslaughter statute. He argues, however, that the issue is preserved for appellate review because it involves a challenge to the court's subject matter jurisdiction, which may be raised for the first time on appeal. Alternatively, he requests this Court to review the issue under the doctrine of plain error.

The State makes several arguments in support of its contention that appellant's conviction of felony murder should be affirmed. Initially, it argues that, because the issue was not raised below, it is not preserved for this Court's review. Moreover, it argues that the common law felony murder doctrine was not preempted by the enactment of the manslaughter by vehicle statute for three reasons.

First, it asserts that the statute deals with the subject of "unintentional homicides" by motor vehicle. It argues that, because felony murder can occur whether death was intended or not, "felony murder does not fall within the 'subject matter' of 'unintended homicides'" contemplated by the statute.

17

Second, the State argues that the rationale for this Court's decision in *Gibson*, 4 Md. App. at 246–47, interpreting the manslaughter by vehicle statute as preempting common law manslaughter was to prevent a "nonsensical incongruity" where a prosecutor could choose to charge a person with the common law felony of manslaughter, with a ten-year penalty, or the statutory misdemeanor, with a three-year penalty, even where the proof to justify conviction was the same. It contends that there is no such incongruity with felony murder, which is intended to deter individuals from engaging in a felony, and the manslaughter by vehicle statute, which "contemplates punishment only for the act of dangerous driving."

Third, the State asserts that this Court must presume that the General Assembly did not intend to preempt the common law felony murder doctrine absent a clear legislative intent to do so, and there was no evidence of such intent here. Moreover, the State notes the illogical result that would occur in this case if appellant's position was accepted. Where the three co-defendants pled guilty to felony murder, it would not make sense that appellant, the one who directly caused the victim's death, would avoid a murder conviction.

Finally, the State contends that, even if this Court accepts appellant's argument that the manslaughter by vehicle statute preempted the common law felony murder doctrine where the killing was unintentional, there was no preemption here because there was evidence that appellant intended to run over Officer Caprio. Accordingly, the State argues that it could prosecute and convict appellant of felony murder.

We first address the State's argument that the issue of preemption is not preserved for appellate review because it was not raised in the circuit court. Generally, an appellate

18

court will not address an issue not raised in or decided by the trial court. *Lane v. State*, 348 Md. 272, 278 (1997). *Accord* Md. Rule 8-131(a). One exception to this general rule of preservation, however, applies where the challenge is to the circuit court's subject matter jurisdiction. Such a challenge may be brought at any time, even if it was not raised at trial, because "where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense." *Williams v. State*, 302 Md. 787, 791–92 (1985). *Accord Lane*, 348 Md. at 278 (reviewing question of whether second-degree rape of a spouse was a crime because "a court may not validly enter a conviction on a charge that does not constitute a crime and . . . the deficiency in any such judgment is jurisdictional in nature").

In this case, appellant does not argue that first-degree felony murder is not a cognizable crime. It clearly is a cognizable crime, and appellant's reliance on subject matter jurisdiction as a basis to excuse his failure to raise the issue below is misplaced.

We conclude, however, that the issue is properly before this Court for a different reason. If appellant's contention is correct, and the manslaughter by automobile statute preempted a charge of felony murder when the homicide was committed by motor vehicle, then appellant's argument that he should not have been charged, convicted, or sentenced for the conviction of felony murder could be construed as an argument that he was given an illegal sentence. *See Roary v. State*, 385 Md. 217, 225–26 (2005), *overruled on other grounds by State v. Jones*, 451 Md. 680, 704 (2017) (A "sentence imposed under an entirely inapplicable statute is an illegal sentence which may be challenged at any time."). *Accord*

19

*Fisher v. State*, 367 Md. 218, 239–40 (2011) (reviewing claim that felony murder doctrine is inapplicable to a homicide resulting from child abuse because, if true, the sentence imposed on the felony murder conviction would be an illegal sentence); *Moosavi v. State*, 355 Md. 651, 662 (1999) ("[W]here a defendant has been charged and convicted under an entirely inapplicable statute, but has not raised the issue on appeal, this Court has reviewed the issue on the theory that the resulting sentence under the inapplicable statute is an illegal sentence which may be challenged at any time."). Accordingly, we will consider this issue, even though it was not raised below.

Appellant argues that the manslaughter by vehicle statute, now codified as CR § 2-209, preempts a charge of felony murder when a motor vehicle is involved.[15] In support, he relies on *Gibson* and *Blackwell*, *supra*.

In *Gibson*, 4 Md. App. at 238–40, this Court addressed whether the manslaughter by automobile statute (codified at the time as § 388 of Article 27 of the Maryland Code (1967 Repl. Vol.)) preempted the common law manslaughter offenses with which the

---

[15] CR § 2-209 provides, in pertinent part:

(a) In this section, "vehicle" includes a motor vehicle, streetcar, locomotive, engine, and train.

(b) A person may not cause the death of another as a result of the person's driving, operating, or controlling a vehicle or vessel in a grossly negligent manner.

(c) A violation of this section is manslaughter by vehicle or vessel.

(d)(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $5,000 or both.

defendant was charged after he killed a woman while drunk driving. We answered that question in the affirmative, explaining as follows:

> We believe that the Legislature in enacting Section 388 to punish persons who cause the death of another 'as the result of the driving, operation or control of an automobile [. . .] in a grossly negligent manner,' **intended to treat all unintended homicides thereby resulting in the same way**, without regard to whether the homicide occurred in the course of doing a lawful or an unlawful act, or whether such act was malum in se or merely malum prohibitum. To otherwise conclude would be to attribute an intention to the Legislature to permit the prosecution of offenders either for the felony of common law manslaughter, with its ten-year penalty, or for the statutory misdemeanor of manslaughter by automobile, with its three-year penalty, even though, where the prosecution is based upon gross negligence, the proof necessary to justify a conviction in either case would be precisely the same (a wanton or reckless disregard to human life). . . . We conclude, therefore, that in enacting Section 388, **the Legislature intended to deal with an entire subject matter[—]unintended homicides resulting from the operation of a motor vehicle**[—]and that the common law crime of involuntary manslaughter, when based on homicides so occurring, is in conflict with the statute and must yield to it to the extent of the inconsistency.

*Id.* at 246–47 (emphasis added). The Court went on to state, however, that the manslaughter by automobile statute did not "abrogate the crime of manslaughter in those cases where the killing was accomplished by intentionally running over the victim in an automobile." *Id.* at 248 n.5.

In *Blackwell*, 34 Md. App. at 555, this Court extended *Gibson*'s preemption principle to apply to second-degree murder involving a motor vehicle. In that case, Blackwell killed a cyclist while driving drunk, and he was convicted of second-degree murder. *Id.* at 549. On appeal, this Court noted its prior holding in *Gibson* that, "in enacting the manslaughter by automobile statute, the legislature intended to preempt the

21

subject matter of unintended homicides resulting from the operation of a motor vehicle."

*Id.* at 554 (citation omitted). We then stated:

> In the absence of evidence of intentional homicide, we hold that the statutory preemption applies as well to second degree murder as it did in [*Gibson*] to manslaughter. We hasten to add on the other hand, that under proper circumstances where the resultant death was intended, a conviction for murder may result, notwithstanding the use of an automobile as the instrumentality of death.

*Id.* at 555.

Appellant urges this Court to extend the preemption principle to felony murder when it is committed using a motor vehicle. As noted, the cases to which appellant cites found preemption in situations involving "unintended homicides resulting from the operation of a motor vehicle." *Blackwell*, 34 Md. App. at 554; *Gibson*, 4 Md. App. at 247. Felony murder, however, is not an unintended homicide.

To be sure, intent to kill is not a required element of felony murder. *See State v. Allen*, 387 Md. 389, 398 (2005) ("[T]he State need not prove that the defendant intended to commit murder, it must establish that the defendant intended to commit the predicate felony."); *Whittlesey v. State*, 326 Md. 502, 520–21 ("[A]n intent to kill is not a necessary element" of felony murder.), *cert. denied*, 506 U.S. 894 (1992); *Newton v. State*, 280 Md. 260, 272 (1977) ("Once the State proves a killing during an enumerated felony, the offense of first degree murder is necessarily established, regardless of any evidence relative to wilfulness, deliberation and premeditation."). For a homicide to constitute murder, however, the homicide must be committed with malice, a mental state that includes an intent to do the "death-producing act in the course of the commission, or attempted

22

commission, of a felony." *Selby v. State*, 76 Md. App. 201, 210 (1988), *aff'd*, 319 Md. 174 (1990). A person acting with this intent is guilty of felony murder. *Id.*

The Court of Appeals has explained that, under the felony-murder rule, "the malice involved in the underlying felony is permitted to stand in the place of the malice that would otherwise be required with respect to the killing." *Allen*, 387 Md. at 402. *Accord* Charles E. Moylan, Jr., *Criminal Homicide Law* § 5.1 (2002). Felony murder is not, therefore, within the scope of unintended homicides. Accordingly, felony murder is not preempted by the manslaughter by automobile statute when the homicide involves a motor vehicle.

Moreover, we note that, although appellant argues that the killing here was unintentional, the jury in this case was not asked to, and it did not specify, whether it found an unintentional homicide. The State argued, and the facts would have permitted a finding, that appellant intended to run over Officer Caprio when he hit the gas while she was standing in front of the car. Accordingly, we reject appellant's argument that his felony murder conviction should be vacated because the manslaughter by vehicle statute (CR § 2-209) preempted his felony murder conviction.

## II.

### Jury Instruction

Appellant's next contention pertains to a requested jury instruction regarding parental notification when juveniles are in police custody. At trial, Detective Barton testified that he did not attempt to contact appellant's parents after appellant was taken into custody and prior to the interview. At the conclusion of all evidence, appellant's trial counsel requested a jury instruction tracking language in Md. Code Ann., Courts & Judicial

23

Proceedings Article ("CJ") § 3-8A-14(b) (2013 Repl. Vol), which provides that, "[i]f a law enforcement officer takes a child into custody, the officer shall immediately notify, or cause to be notified, the child's parents, guardian, or custodian of the action." Counsel argued that an instruction tracking this statute was necessary because it went to the voluntariness of appellant's statements to Detective Barton during the interview.[16]

The State argued that the instruction was not necessary because Maryland Pattern Jury Instruction ("MPJI-CR") 3:18 discussed all the factors the jury needed to consider to determine whether a statement was voluntary. It asserted that the statute cited by appellant "merely says the police should contact the parent," and "it has nothing to do with state of mind of [appellant] or coercion."

The circuit court denied appellant's request for an additional instruction. It stated that MPJI-CR 3:18 "sufficiently quantified the issues in this case" with regard to appellant's statements to police. It then instructed the jury consistent with that pattern instruction, as follows:

> You've heard evidence that the defendant made a statement to the police about the crime charged.
>
> The State must prove beyond a reasonable doubt that the statement was voluntarily made. A voluntary statement is one that under all circumstances was given freely. To be voluntary, a statement must not have been compelled or obtained as a result of any force, promise, threat, inducement or offer of reward. If you decide that the police used force, a threat, promise or inducement in obtaining Defendant's statement, then you must find that the statement was involuntary and disregard it, unless the State has proven beyond a reasonable doubt that the force, threat, promise or

---

[16] Appellant's trial counsel proffered that he had suggested language for the requested special instruction, but he could not immediately locate it. He then stated that he wanted the language from CJ § 3-814.

24

inducement did not in any way cause the Defendant to make the statement. If you do not exclude the statement for one of these reasons, you then must decide whether it was voluntary under the circumstances.

In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement, including the conversations, if any, between the police and the Defendant; whether the Defendant was advised of his rights; the length of time that the Defendant was questioned; who was present; the mental and physical condition of the Defendant; whether the Defendant was subjected to force or threat of force by the police; age, background, experience, education, character, and intelligence of the Defendant; and any other circumstances surrounding the taking of the statement.

If you find beyond a reasonable doubt that the statement was voluntary, then you must give it such weight as you believe it deserves. If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it.

*See* MPJI-CR 3:18.

On appeal, appellant contends that the circuit court "abused its discretion by failing to instruct the jury that it may consider whether there was a denial of a parent at the juvenile's interrogation in determining whether [appellant's] statement to the police was voluntary." He asserts that the failure to so instruct deprived him "of due process and protection against self-incrimination pursuant to the Fifth and Fourteenth Amendments of the United States Constitution and Articles 22 and 24 of the Maryland Declaration of Rights." He argues that the requested instruction was a correct statement of law, and it was not properly covered by the instruction provided because, although it instructed the jury to consider who was present in the interrogation, it did not inform the jury that it may consider "who was *not* present." Appellant further contends that the requested instruction was

25

"factually generated by 'some evidence'" because Detective Barton testified that he did not inform appellant of his right to contact a parent.

The State contends that this issue is not preserved for review. In any event, it argues that the circuit court properly denied appellant's request for the special instruction.

We begin with the State's preservation argument. Initially, the State notes that CJ § 3-814, the statute cited below and on appeal, does not contain language regarding notification of parents, and it is inapplicable here because it refers solely to Child in Need of Assistance ("CINA") cases, not criminal cases. It asserts that the statute to which appellant seems to be referring is an older version of CJ § 3-814, which was renumbered to CJ § 3-8A-14 in 2001. *See* 2001 Md. Laws, Ch. 415. Because appellant cited, both at trial and in his brief on appeal, the wrong statute, the State asserts that appellant's argument is technically unpreserved for review. *See In re Kaleb K.*, 390 Md. 502, 512 (2006) (Argument unpreserved because defense cited the wrong statute.).

We are not persuaded. Appellant's counsel merely miscited the statutory provision number. Because the substantive issue was raised and considered by the circuit court, we will not treat this misstatement as a failure to preserve the issue.

The State further argues, however, that the issue is not preserved for review because the argument advanced on appeal, that the court erred in failing to give an instruction that the jury could consider that appellant was denied access to a parent, was not made below. We agree.

"Ordinarily, the appellate court will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131(a).

26

*Accord Alston v. State*, 414 Md. 92, 110–12 (2010) (Argument regarding jury instructions was waived because it was not requested below.); *Pitts v. State*, 250 Md. App. 496, 528 (2021) (Appellant who never requested jury instruction could not argue on appeal that the court should have given the instruction.).

Here, appellant argued in the circuit court that the court should instruct the jury that the police are required to notify parents when a juvenile is taken into custody. That is different from an instruction advising that the jury could consider, in assessing voluntariness of a statement, that a juvenile was *denied* access to a parent prior to making the statement. Accordingly, this issue is not preserved for review.

Even if the issue was preserved for review, we would conclude that it was without merit. A trial court's decision whether to give a jury instruction "will not be disturbed except on a clear showing of an abuse of discretion, that is, discretion manifestly unreasonable or exercised on untenable grounds, or for untenable reasons." *State v. Sayles*, 472 Md. 207, 230 (2021). Appellant has not made such a showing here.

A trial court is required to give a specific instruction when "(1) the instruction is a correct statement of law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in jury instructions actually given." *Wright v. State*, __ Md. __, No. 40, Sept. Term 2020, slip op. at 14 (filed July 13, 2021) (quoting *Thompson v. State*, 393 Md. 291, 302 (2006). An instruction regarding the duty to contact a parent set forth in CJ § 3-8A-14(b) did not meet those requirements because it is not applicable under the facts of this case.

CJ § 3-8A-14(b), which addresses children who are not CINAs, provides as follows:

27

If a law enforcement officer takes a child into custody, the officer shall immediately notify, or cause to be notified, the child's parents, guardian, or custodian of the action. After making every reasonable effort to give notice, the law enforcement officer shall with all reasonable speed:

> (1) Release the child to the child's parents, guardian, or custodian or to any other person designated by the court, upon their written promise to bring the child before the court when requested by the court, and such security for the child's appearance as the court may reasonably require, unless the child's placement in detention or shelter care is permitted and appears required by § 3-8A-15 of this subtitle; or

> (2) Deliver the child to the court or a place of detention or shelter care designated by the court.

In *Jones v. State*, 311 Md. 398, 400 (1988), the Court of Appeals addressed whether CJ § 3-8A-14(b)'s parental notification requirement (codified at the time at CJ § 3-814(b)) applied to a juvenile arrested and charged with first-degree murder.[17] Mr. Jones argued that the plain language and legislative intent of the provision was applied to all juveniles taken into custody. *Id.* at 403–04. In rejecting this argument, the Court stated as follows:

> Jones's reading of [§ 3-8A-14] simply cannot be harmonized with its immediate context, for it creates a strained and illogical transition from the first sentence of [§ 3-8A-14(b)] to the second. The second sentence provides for the release of the child to its "parents, guardian, or custodian or to any other person designated by the court" or, alternatively, for delivery of the child "to the court or a place of detention or shelter care designated by the court." We think it plain that the legislature, in enacting [§ 3-8A-14], did not intend to require the release of a juvenile to the child's parent or guardian when, as here, the crimes charged—first degree murder and armed robbery—were both beyond the jurisdiction of the juvenile court. There can be no doubt that the statutory reference to "the court" means the juvenile court; the "court" is so defined in [CJ § 3-8A-01(j)] and is consistently used with this meaning throughout [§ 3-8A-14]. . . .

---

[17] As indicated, in 2001, CJ § 3-814 was recodified as CJ § 3-8A-14 without substantive change. 2001 Md. Laws, Ch. 415.

Nor can Jones's interpretation of [§ 3-8A-14(b)] be harmonized with the purposes of the Juvenile Causes Act as a whole. Although the special protections thereby afforded to children are not in express terms limited to children within the jurisdiction of the juvenile court, it is clear the legislature did not intend to extend these protections to all children. [CJ § 3-8A-02(a)] states: "The purposes of this subtitle are: [(4)] To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle. . . ." Manifestly, therefore, some children were excluded from the protective ambit of the Act. Who these children would be, if not those expressly removed from juvenile court jurisdiction . . ., is opaque at best. We think a more natural interpretation of [§ 3-8A-02(a)(4)] would find in it a recognition by the legislature that some children are not in a position to benefit from the Act's special treatment, and that among these children are those, as here, expressly removed from juvenile court jurisdiction. Thus, to extend the parental notification requirements of [§ 3-8A-14(b)] to an individual charged with offenses beyond the juvenile court's jurisdiction would be inconsistent with the stated purposes of the Juvenile Causes Act.

\* \* \*

As [§ 3-8A-14(b)] has no application in this case, noncompliance with its provisions had no direct bearing on the validity of Jones's *Miranda* waiver or the traditional voluntariness of his ensuing confession. The purpose of [§ 3-8A-14(b)] is to protect the child from unnecessary separation from a parent or guardian.

*Id.* at 405–07.

Here, as in *Jones*, CJ § 3-8A-14(b) did not apply because appellant was charged with offenses beyond the juvenile court's jurisdiction. Appellant, who was 16 years old at the time of the crime, was charged with felony murder, which carries a sentence of life imprisonment. *See* CR § 2-201(b)(1). CJ § 3-8A-03(d)(1) provides that a juvenile court does not have jurisdiction over "[a] child at least 14 years old alleged to have done an act that, if committed by an adult, would be a crime punishable by life imprisonment, as well as all other charges against the child arising out of the same incident[.]" The court did not

abuse its discretion in declining to provide a jury instruction on this inapplicable statutory provision.[18]

## III.

## Life Sentences for Juveniles

Appellant next contends that the circuit court erred in automatically sentencing him to a life sentence "without proper consideration of his youth and all of its attendant circumstances and the penological justification for imposing such a sentence" on a juvenile convicted of felony murder. Appellant points to the developmental and cognitive differences between juveniles and adults, which he asserts establishes the "diminished culpability of a juvenile offender," and he argues that a life sentence, imposed without considering those factors, is "unconstitutionally cruel and unusual punishment," in violation of the Eighth Amendment of the U.S. Constitution and Articles 16 and 25 of the Maryland Declaration of Rights.

---

[18] Moreover, MPJI-CR 3:18, the instruction provided to the jury, "fairly covered" appellant's concern about the lack of parental notification and involvement in the interview on the voluntariness of his confession. *See* Md. Rule 4-325(c). That instruction directed the jury to consider "who was present" when the statement was made, "the mental and physical condition of the defendant," the "age, background, experience, education, character, and intelligence of the defendant," and "any other circumstances surrounding the taking of the statement." MPJI-CR 3:18. Accordingly, the instruction "provided ample guidance for the jury" to consider the presence, or lack thereof, of a parent when determining the voluntariness of appellant's interview statements. *See Dickey v. State*, 404 Md. 187, 203–04 (2008) (Defendant was not entitled to jury instruction that testimony by a witness who uses drugs must be examined with greater scrutiny than other witnesses because the provided instructions on the consideration of the witness' perception, memory, and state of mind, coupled with his testimony regarding his drug use, "provided ample guidance for the jury to make credibility assessments.").

Appellant further contends that a life sentence is particularly unjust for a juvenile convicted of felony murder because the crime relies on transferred intent and is premised on the idea that someone committing a dangerous felony should understand the risk that someone could be killed, but juveniles lack the ability to fully consider the consequences of their actions. As a result, he argues that an automatic life sentence is "grossly disproportionate" for a juvenile convicted of felony murder, and he urges this Court to join the "national shift in the applicability of the felony murder rule" with respect to juveniles.

The State contends that the sentencing court did not err in imposing a life sentence with the possibility of parole for felony murder. It acknowledges that the Supreme Court has held that the imposition of a mandatory sentence of life *without* parole, without consideration of the characteristics of juveniles, violates the Eighth Amendment's prohibition on "cruel and unusual punishments." Appellant, however, did not receive a sentence of life *without* parole, but rather, he received a sentence of life *with* the possibility of parole.

The State argues that this Court, in *Hartless v. State*, 241 Md. App. 77, 87–92, *cert. granted*, 465 Md. 644 (2019), *and appeal dismissed*, __Md.__ (2021), rejected the argument that an individualized sentencing process was required if the life sentence included the possibility of parole. In any event, the State argues that the sentencing court in this case considered appellant's youth and its attendant circumstances before imposing sentence.

The State further argues that Harris's life sentence for felony murder is "not grossly disproportionate, either generally or as applied to him." It notes that a significant factor in

31

the proportionality analysis is the seriousness of the conduct involved, and appellant's actions here, driving over a police officer standing in front of his vehicle to flee the scene of a burglary, was "extremely serious." The State further challenges appellant's assertion that there is a "national consensus" against convicting juveniles of felony murder and imposing life sentences, and it contends that changes to the felony murder doctrine are best left to the legislature.

The Eighth Amendment to the United States Constitution prohibits the imposition of "cruel and unusual punishments." U.S. Const. amend. VIII. Similarly, Article 25 of the Maryland Declaration of Rights prohibits the courts from imposing "cruel or unusual punishment," and Article 16 of the Maryland Declaration of Rights provides "[t]hat sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."[19]

The issue of what constitutes cruel and unusual punishment in the context of juvenile offenders has been the subject of much litigation. Before addressing appellant's specific claims, we will discuss that precedent.

---

[19] Article 16 and 25 generally are given the same interpretation as the Eighth Amendment, *Miles v. State*, 435 Md. 540, 552–55 (2013) (regarding Art. 16); and *Thomas v. State*, 333 Md. 84, 103 n.5 (1993) (regarding Art. 25), but appellant has not offered any argument that the protections afforded by the Maryland Declaration of Rights are different or greater, so we analyze solely on the basis of the Eighth Amendment.

**A.**

**United States Supreme Court Precedent**

In the past two decades, "the [United States] Supreme Court has issued a series of decisions in which it held that the Eighth Amendment to the federal Constitution places limits on the sentencing of juvenile offenders that do not apply to the sentencing of adult offenders." *Carter v. State*, 461 Md. 295, 308 (2018). These cases, although distinguishable from this case, form the basis for the issues presented by appellant.

In *Roper v. Simmons*, 543 U.S. 551, 572–73 (2005), the Supreme Court held that the Eighth Amendment's cruel and unusual punishments clause prohibits the imposition of the death penalty to an offender who committed a crime while he or she was a juvenile. The Court noted, as appellant does here, various characteristics that distinguish juvenile offenders from adult offenders, such as a "lack of maturity and an underdeveloped sense of responsibility" resulting in "impetuous and ill-considered actions and decisions," that juveniles are "more vulnerable or susceptible to negative influences and outside pressures" due, in part, to juveniles having less control over their own environments, and the "character of a juvenile is not as well formed as that of an adult," in that "[t]he personality traits of juveniles are more transitory, less fixed." *Id.* at 569–70. *Accord Carter*, 461 Md. at 309. As a result, the Court concluded that the differences between juveniles and adults "are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Roper*, 543 U.S. at 572–73.

In *Graham v. Florida*, 560 U.S. 48, 75 (2010), the Supreme Court held that the "Eighth Amendment prohibits a State from imposing a life without parole sentence on a

juvenile nonhomicide offender."  As the Court of Appeals summarized in *Carter*, 461 Md. at 310–11:

> The [Supreme] Court [in *Graham*] first considered whether there were "indicia of a national consensus" on the subject. After reviewing various statistics on state laws concerning juvenile sentencing and actual practice, the Court concluded that "life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual." 560 U.S. at 66, 130 S.Ct. 2011. The Court then considered whether the challenged practice serves legitimate penological goals. The Court reiterated its analysis in *Roper* that juveniles have "lessened culpability" in comparison to adults. It also distinguished between homicide and non-homicide offenders, recognizing that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious form of punishment than are murderers." *Id.* at 69, 130 S.Ct. 2011. Accordingly, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id.* The Court also noted that life without parole is an "especially harsh" sentence for a juvenile defendant as it condemns the juvenile to a larger percentage of the individual's life in prison than a much older individual who receives the same sentence. *Id.* at 70, 130 S.Ct. 2011.
>
> The Court concluded that, although legislatures are not required to adopt any particular penological theory, no theory could justify a sentence of life without parole for a juvenile offender who had not committed murder. 560 U.S. at 71, 130 S.Ct. 2011. The Court considered the common purposes of sentencing schemes: retribution, deterrence, incapacitation, and rehabilitation. Retribution was insufficient because "the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender[,]" and that "the case for retribution is not as strong with a minor as with an adult." *Id.* (internal citations and quotation marks omitted). Deterrence could not justify the sentence because the characteristics that make juveniles more likely to make bad decisions also make them less likely to consider the possibility of punishment, which is a prerequisite to a deterrent effect. *Id.* at 72, 130 S.Ct. 2011. Incapacitation could not support the sentence because of the difficulty in determining whether a juvenile defendant is incorrigible at the time of sentencing – *i.e.*, "to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 72–73, 130 S.Ct. 2011 (quoting *Roper*). Finally, rehabilitation could not justify the sentence because

34

it denies the prisoner the right to "reenter the community [based on] an irrevocable judgment about that person's value and place in society." *Id.* at 74, 130 S.Ct. 2011.

Importantly, the Court stressed that "[a] State is not required to guarantee eventual freedom" because some "who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." 560 U.S. at 75, 130 S.Ct. 2011. However, a State must "give [juvenile] defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* The Court did not purport to dictate how a [S]tate must provide that opportunity, stating that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id.*

Two years later, in *Miller v. Alabama*, 567 U.S. 460, 465 (2012), the Court expanded its reasoning to juveniles convicted of a homicide. It held that a "mandatory life without parole [sentence] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments." The Court did not categorically bar life sentences without parole for juveniles, but it held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. It held that a court was required to take "into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.[20]

---

[20] As the Court of Appeals explained in *Carter v. State*, 461 Md. 295, 312 (2018):

*Miller* was not simply an extension of *Graham*, but rather a synthesis of two distinct principles. The first principle is that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. at 471, 132 S.Ct. 2455. The second principle is that individualized sentencing is required before imposing harsh and immutable sentences. *Id.* at 475, 132 S.Ct. 2455. "[T]he confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id*. at 470, 132 S.Ct. 2455.

In *Montgomery v. Louisiana*, 577 U.S. 190, 208–09 (2016), the Supreme Court held that *Miller*'s limitations on life without parole for juvenile offenders applied retroactively. The Court noted that "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at 210. Trial courts were not, however, required "to make a finding of fact regarding a child's incorrigibility." *Id.* at 211.

Recently, in *Jones v. Mississippi*, 141 S.Ct. 1307, 1316, 1318 (2021), the Supreme Court explained that *Miller* "required a discretionary sentencing procedure" and

> mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. *Id.*, at 483, 132 S.Ct. 2455. In that process, the sentencer will consider the murderer's "diminished culpability and heightened capacity for change." *Id.*, at 479, 132 S.Ct. 2455. That sentencing procedure ensures that the sentencer affords individualized "consideration" to, among other things, the defendant's "chronological age and its hallmark features." *Id.*, at 477, 132 S.Ct. 2455.

The Court held that "an on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth" before imposing a sentence of life without parole on a juvenile. *Id.* at 1319.

Appellant relies on these cases in discussing the differences between juveniles and adults. These cases however, involved sentences of death or life *without* parole, whereas appellant received a sentence of life *with* the possibility of parole. The Supreme Court has never indicated that such a sentence in a homicide case would constitute cruel and unusual punishment. Indeed, it has said: "[I]n a case involving an individual who was under 18

when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313.

## B.

## Maryland Precedent

Maryland law provides that "[a] person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to imprisonment for life without the possibility of parole; or imprisonment for life." CR § 2-201(b)(1). Accordingly, a first-degree murder conviction carries a mandatory life sentence. *State v. Crawley*, 455 Md. 52, 54 (2017) ("All forms of first degree murder carry a statutorily-mandated life sentence."). The sentencing court, however, has the discretion to suspend any portion of the sentence if the suspended portion includes a period of probation. Md. Code Ann., Crim. Proc. Article ("CP"), § 6-222(a) (2018 Repl. Vol.).

In *Carter*, 461 Md. at 306–07, the Court of Appeals addressed three consolidated cases in which the juvenile defendants argued that, although their sentences technically were not life without the possibility of parole, they were "effectively serving a sentence of life without parole, because the laws governing parole in Maryland do not provide [them] with a 'meaningful opportunity to obtain release.'" *Id.* at 307. As relevant to this appeal, the Court rejected that contention with respect to the two defendants who received life sentences with the possibility of parole. It held that the State's parole system, "including the statute, regulations, and [the Governor's 2018] executive order, provides a juvenile offender serving a life sentence with a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Id.* at 365. Accordingly, it held that the life

37

sentences "do not inherently violate the Eighth Amendment and are not illegal for that reason." *Id.* [21]

In *Hartless*, 241 Md. App. at 85, this Court considered appellant's argument that his life sentence was illegal because he was entitled to an "individualized sentencing process," at which the circuit court must "expressly consider his youth and attendant circumstances," regardless of whether he was given an opportunity for parole. We noted that Hartless did not rely on *Miller* for this argument, stating: "Indeed, if a *Miller* violation can be remedied simply by permitting a juvenile offender to be considered for parole, it is illogical to suggest that *Montgomery* and *Miller* somehow require an individualized sentencing process for *all juveniles* convicted of homicide, regardless of whether they are sentenced to life with or without parole." *Id.* at 87.

This Court then rejected Hartless' reliance on *Carter* for this argument, explaining as follows:

> We find no support in *Carter* for Hartless' proposition that all juvenile offenders convicted of homicide have the right to an individualized sentencing process that takes account of the offender's youth. In our view, the identification of Hartless' proposed right is unsupported by the context of the various examples of quoted language, as well as inconsistent with Supreme Court authority. *Carter* held that a sentence of life imprisonment with the possibility of parole for juvenile homicide offenders does not violate

---

[21] Appellant's argument on appeal addresses the sentence imposed, not whether he has a subsequent meaningful opportunity for release. Nevertheless, we note that, in addition to established opportunities for parole, recently enacted legislation provides that appellant may file a motion to reduce the duration of his sentence after 20 years of incarceration. *See* 2021 Md. Laws, Ch. 61 (CR §§ 6-235; 8-110, effective October 1, 2021) (An individual that was convicted as an adult for an offense committed when the individual was a minor, was sentenced for the offense before October 1, 2021, and has been imprisoned for at least 20 years for the offense may file a motion to reduce the duration of the sentence and receive a hearing.).

the Eighth Amendment. This is the sentence Hartless received. We, therefore, reject Hartless' contention that his sentence is unconstitutional because he did not receive an individualized sentencing hearing at which the circuit court expressly considered his youth and attendant circumstances.

*Id.* at 91–92 (footnote omitted).[22]

In *Holly v. State*, 241 Md. App. 349, 352 (2019), this Court addressed Holly's argument that his life sentence with parole was unconstitutional because the parole system did "not provide a right to state-furnished counsel at parole hearings, public funds for experts, or judicial review of parole decisions." In rejecting this argument, this Court noted that the Court of Appeals had held that the "juvenile homicide offenders' life sentences with parole were legal because 'the laws governing parole of inmates serving life sentences in Maryland . . . allow a juvenile offender serving a life sentence a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."'" *Id.* at 355 (quoting *Carter*, 461 Md. at 307).

With that background, we address appellant's argument on appeal.

---

[22] On August 26, 2019, the Court of Appeals granted *certiorari* in *Hartless*. *Hartless v. State*, 465 Md. 664 (2019). That appeal was stayed on March 11, 2020, pending the Supreme Court's decision in *Jones v. Mississippi*, 141 S.Ct. 1307 (2021). The Supreme Court issued its decision in *Jones* on April 22, 2021. The Court held, as indicated, that a judge must consider the defendant's youth before sentencing a defendant to life without the possibility of parole, but no on-the-record sentencing explanation is required. *Jones*, 141 S.Ct. at 1318–19. On May 27, 2021, the Court of Appeals issued an order lifting the stay in *Hartless* and dismissing the appeal. We note that the parties' briefs in this case were filed, and oral argument occurred, while the appeal in *Hartless* was stayed in the Court of Appeals and prior to the Supreme Court's decision in *Jones*.

## C.

## Individualized Sentencing

Appellant initially contends that his life sentence for felony murder is an illegal sentence because the court failed to conduct an individualized hearing to consider his "youth and all of its attendant circumstances and the penological justification for imposing such a sentence." As appellant acknowledges, this Court rejected a similar argument in *Hartless*, 241 Md. App. at 92, holding that the constitutional requirement of "individualized sentencing" where the defendant's youth and its attendant circumstances are considered is limited to the context of a sentence of life without parole. *Accord Bowling v. Director, Va. Dep't of Corr*., 920 F.3d 192, 199 (4th Cir. 2019) ("*Miller* and its lineage gives rise to a constitutionally protected liberty in juvenile-specific Eighth Amendment protections," but those "juvenile-specific Eighth Amendment protections do not apply" to juveniles sentenced to life with parole.), *cert. denied*, 140 S.Ct. 2519 (2020); *State v. Seam*, 823 S.E.2d 605, 610 (N.C. Ct. App. 2018) ("*Miller* specifically requires such an individualized consideration of . . . mitigating factors only in cases where a juvenile defendant has been sentenced to life imprisonment *without* the possibility of parole."), *aff'd*, 837 S.E.2d 870 (N.C. 2020).

In his brief, appellant stated that he was "hopeful" that *Hartless* would be reversed by the Court of Appeals. As indicated, however, the Court subsequently dismissed the petition for a writ of certiorari in that case, and our decision in *Hartless* controls.

We further note that appellant's youth was presented to the court for consideration in the presentence investigation report ("PSI") and by defense counsel.[23]  Counsel for appellant acknowledged at oral argument that defense counsel's argument below was not limited in this regard, and the circuit court said that it had considered all the evidence and all factors.  Appellant's contention that his sentence is unconstitutional because he did not receive an individualized sentencing hearing is without merit.

## D.

## Disproportionate Sentence

Appellant next contends that "an automatic life sentence for a juvenile convicted of felony murder is "grossly disproportionate" and unconstitutional.  The State disagrees.

The Eighth Amendment encompasses a narrow proportionality principle prohibiting "grossly disproportionate" sentences.  *State v. Stewart*, 368 Md. 26, 31 (2002) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring)).  Successful challenges on this ground are "exceedingly rare."  *Id.*

Appellant did not argue below that his life sentence constituted cruel and unusual punishment.  He argues, however, that his sentence was illegal pursuant to the Eighth Amendment, and therefore, the issue may be raised at any time.  We agree that the issue is properly before the Court even though it was not raised below.  *See Randall Book Corp. v. State*, 316 Md. 315, 322 (1989) (Appellant's argument that the imposed sentences "constitute[d] cruel and unusual punishment prohibited by the Eighth Amendment is

---

[23] Because PSI reports are confidential, we will not discuss the details of this report. Md. Code Ann., Corr. Servs. Article § 6-112(a)(2) (2017).

cognizable under a claim of an illegal sentence."). *Accord Hartless*, 241 Md. App. at 84–85 (motion to correct illegal sentence may be raised at any time). We review the constitutional issue *de novo*. *Bishop v. State*, 218 Md. App. 472, 504 (2014) (An illegal sentence, which may be corrected at any time, is reviewed by this Court *de novo*.), *cert. denied*, 441 Md. 218 (2015).

This Court has set forth a two-step process for reviewing a proportionality challenge:

> [A] reviewing court must first determine whether the sentence appears to be grossly disproportionate. In so doing, the court should look to the seriousness of the conduct involved, the seriousness of any relevant past conduct as in the recidivist cases, any articulated purpose supporting the sentence, and the importance of deferring to the legislature and to the sentencing court. *See* [*State v.*] *Davis*, 310 Md. [611,] 631–32, 530 A.2d 1223 [ (1987)] and *Minor* [*v. State*], 313 Md. [573,] 583–84, 546 A.2d 1028, [(1988)].
>
> If these considerations do not lead to a suggestion of gross disproportionality, the review is at an end. If the sentence does appear to be grossly disproportionate, the court should engage in a more detailed . . . analysis. It may conduct an intra- and inter-jurisdictional analysis as a vehicle for comparison and as a source of objective standards; it must, however, remember that under principles of federalism, a state legislature may choose to impose a more severe penalty than other states consider appropriate. In order to be unconstitutional, a punishment must be more than very harsh; it must be grossly disproportionate.

*Howard v. State*, 232 Md. App. 125, 175–76 (quoting *Thomas v. State*, 333 Md. 84, 95–96 (1993)), *cert. denied*, 453 Md. 366 (2017).

Pursuant to this analysis, "we look first to the seriousness of the defendant's conduct." *Stewart*, 368 Md. at 34. Here, appellant's particular conduct was extremely serious. While fleeing the scene of a felony burglary, he drove over and killed a police

42

officer who was standing in front of his vehicle. Under such circumstances, a life sentence was not "extreme," and it did not raise an inference of gross disproportionality. *See Stewart*, 368 Md. at 32. Indeed, the General Assembly's determination that felony murder committed during a burglary constitutes first-degree murder indicates the seriousness of this offense. *See Solem*, 463 U.S. at 290 n.16 ("In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.").

Appellant's life sentence does not pass the first step in the proportionality analysis. Given that his conduct caused another person to lose her life, the life sentence does not appear grossly disproportionate.

Accordingly, we need not engage in further proportionality review. *See Stewart*, 368 Md. at 38. We do note briefly, however, that the Supreme Court of Iowa recently rejected an argument similar to that made by appellant, i.e., that there was a "national consensus" against sentencing juvenile offenders convicted of felony murder to life with parole. *State v. Harrison*, 914 N.W.2d 178, 198, 205 (Iowa 2018).

We hold that appellant's sentence of life with the possibility of parole was not grossly disproportionate, and it did not constitute cruel and unusual punishment.

## IV.

### Plain Error Review

Appellant's final contention is that the felony murder doctrine, as applied to juveniles, is unconstitutional because it violates the due process clauses of the Fifth and

43

Fourteenth Amendments and Article 24 of the Maryland Declaration of Rights. Recognizing that the issue was not raised below, and therefore, that it is not preserved for appellate review, appellant asks this Court to review the issue under the doctrine of plain error.[24]

We decline to exercise our discretion to conduct plain error review. Although this Court has discretion to review unpreserved errors, the Court of Appeals has explained that "appellate courts should rarely exercise" their discretion under Md. Rule 8-131(a). *Chaney v. State*, 397 Md. 460, 468 (2007). This is because considerations of both

> fairness and judicial efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

*Id. Accord Kelly v. State*, 195 Md. App. 403, 431 (2010), *cert. denied*, 417 Md. 502 (2011), *cert. denied*, 563 U.S. 947 (2011).

We reserve our exercise of plain error review for instances when the "unobjected to error [is] 'compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.'" *State v. Brady*, 393 Md. 502, 507 (2006) (quoting *State v. Hutchinson*, 287 Md. 198, 202 (1980)). *Accord Steward v. State*, 218 Md. App. 550, 566–67, *cert. denied*, 441 Md. 63 (2014). Appellate review based on plain error is "a rare, rare, phenomenon."

---

[24] In his brief, which was filed in this Court prior to the most recent legislative session, appellant stated that he "raises this issue to preserve what may soon be a modification in Maryland's law if a bill is re-introduced seeking abolition of traditional first-degree felony murder convictions for juveniles." This bill was reintroduced during the 2021 session (S.B. 395/H.B. 385), but it did not pass.

44

*Morris v. State*, 153 Md. App. 480, 507 (2003), *cert. denied*, 380 Md. 618 (2004).  We are

not persuaded that this contention of error warrants the exercise of plain error review.

Accordingly, we shall not address it.

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**